[No. S004602. Crim. No. 23430. July 5, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS RAY STANKEWITZ, Defendant and Appellant.

**COUNSEL**

Robert A. Seligson, under appointment by the Supreme Court, and John P. Ward for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Michael T. Garcia, George Hendrickson, Jane Lamborn, Thomas Y. Shigemoto and Robert D. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.**—In *People* v. *Stankewitz* (1982) 32 Cal.3d 80 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476] (*Stankewitz I*), this court reversed defendant's judgment of conviction and sentence of death because of errors relating to defendant's ability to cooperate with and assist the attorney appointed to represent him.

Defendant was retried. At the second trial defendant was accorded both a competency hearing pursuant to Penal Code section 1368[1] and a *Marsden* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) to determine whether there was a conflict between defendant and the public defender who had been appointed to represent defendant. The court

---

[1] All further statutory references are to the Penal Code unless otherwise noted. References are to the 1977 death penalty legislation, in effect on the date of the murder and since repealed by initiative.

found such a conflict, relieved the public defender and appointed private counsel. Defendant was found competent to stand trial. Thereafter, the jury convicted defendant of the first degree murder of Theresa Greybeal (§ 187), and also found defendant guilty of robbery (§ 211) and kidnapping (§ 207). The jury further found that defendant had personally used a firearm during the commission of the offenses. (§ 12022.5.) In addition, the jury found true the special circumstance allegations that the murder was wilful, deliberate and premeditated and was committed by defendant during the commission of a robbery and a kidnapping. (Former § 190.2, subd. (c)(3)(i), (ii).) Following the penalty trial, the jury returned a verdict of death. Appeal is automatic. (§ 1239, subd. (b).)

## I. FACTS

### A. *Guilt Phase*

On the evening of February 7, 1978, defendant, then 19 years old, left Sacramento driving a white Oldsmobile. He was headed for Fresno. In his company were his mother and brother, an older man named J.C., and three young companions, Marlin Lewis, Tina Topping and fourteen-year-old Billy B.

The group reached Manteca about 1 a.m. on February 8, and stopped at a 7-Eleven store to buy oil for the car. Manteca police observed the car irregularly parked and ran a check on the license plate. Information was received indicating that the car had been stolen.[2] Several officers then approached the car and frisked several of the occupants. One of the passengers who identified herself as "Tina Lewis" stated that the car had been borrowed from her uncle in Sacramento. Based on that information the officers contacted Sacramento police, but were unable to determine whether the car had in fact been stolen. The officers asked the group to follow them to the police station. Another attempt was made to contact the vehicle's owner without success. After about an hour and a half, they were allowed to leave, but the vehicle was impounded. Before departing, the group obtained directions to the local bus depot.

The bus depot was not open when they arrived so they waited in a nearby donut shop. After several hours, defendant, Tina Topping, Marlin Lewis, and Billy B. decided to hitchhike. Defendant's mother and brother and J.C. remained at the station. Defendant and his three companions succeeded in hitchhiking as far as Modesto. Unable to get a ride any farther, the four

---

[2] At defendant's first trial, the jury was informed by stipulation that the car had not in fact been stolen. The jury was not so informed in the second trial.

walked to a nearby K mart, where defendant announced that they were "going to look around for a car." Defendant and Tina Topping proceeded to look for a car—apparently to steal—in the parking lot; Billy eventually went inside the K mart. When he exited, he saw Topping pointing toward a woman walking to her parked car. Defendant, Marlin Lewis and Topping followed the woman; as she opened her car door, Topping pushed her inside and entered the car herself. Marlin Lewis then jumped in the backseat and opened the passenger side door, admitting defendant. Topping honked the car horn. Billy, in response, started to walk back toward the store; Topping shouted "come on" and Billy reversed field, ran to the car and got in the backseat with Marlin Lewis. In the meantime, defendant had produced a pistol, and Marlin Lewis produced a knife.

They exited the K mart parking lot, Tina Topping driving, the victim— Theresa Greybeal—seated on the console, and defendant seated next to her in the passenger seat; Billy B. and Marlin Lewis were seated in the back. The group proceeded to the freeway and turned south toward Fresno.

Once on the freeway, Ms. Greybeal stated that none of this would have happened if she had her dog with her. Defendant responded by pulling out his gun and stating, "This would have took care of your dog." After several miles, Tina Topping asked Ms. Greybeal for money and Ms. Greybeal took $32 from her purse and handed it to Marlin Lewis. She also gave Topping her wristwatch, with the comment that she could put in an insurance claim for the loss.

When the group arrived in Fresno they drove directly to a bar called the "Joy and Joy." Tina Topping went into the bar and returned after a few minutes with a woman named Christina Menchaca. Menchaca joined the group, now totalling six, and they drove around the corner to the Olympic Hotel. Topping and Menchaca went into the hotel. A few minutes later they returned to get defendant and all three then reentered the hotel. Several minutes later defendant returned to retrieve the pistol from Marlin Lewis. Shortly thereafter, defendant, Topping and Menchaca returned to the car. They appeared to be moving more slowly; their eyes were glassy.

Tina Topping then suggested they go to Calwa to "pick up," a slang expression meaning to obtain heroin. They drove to Calwa, stopping near a house with a white picket fence. Topping told everyone to get out, she did not want a lot of company when they went to "pick up." Several of the group exited the car, including Billy B., Marlin Lewis, defendant, and the victim, Ms. Greybeal. Billy asked the victim for a cigarette; she gave him one and took one for herself. After two or three minutes, Topping told Billy to get back in the car. Billy reentered the car along with Marlin Lewis.

From inside the car, Billy saw defendant walk toward Ms. Greybeal, who was standing five or six feet away. Ms. Greybeal was facing away from the car. Defendant raised the gun in his left hand, braced it with his right hand, and shot her once in the head from a distance of about one foot. Ms. Greybeal fell to the ground, fatally wounded.

Defendant returned to the car and said, "Did I drop her or did I drop her?" Marlin Lewis responded, "You dropped her." Both were giggling. As the car pulled away, defendant cautioned Tina Topping to drive slowly so they would not get caught. Marlin Lewis observed that the victim's purse was not in the car and concluded, "we made a bad mistake."

After returning to Fresno, the group drove to the Seven Seas Bar and Christina Menchaca went inside to try to sell the victim's watch. Defendant asked her to try to get $60 for it. While Menchaca and Marlin Lewis were inside the bar, two police officers approached the car. Tina Topping told Billy B. to give a false name. He did so and after some brief questioning the officers left. Menchaca returned saying that she had not succeeded in selling the watch and defendant suggested they move on and try to sell it in Clovis.

Defendant's efforts to sell the watch, however, were also unsuccessful. In Clovis a girl informed Billy that his mother had filed a missing person's report on him. Billy asked to be driven home to Pinedale.

When he arrived home, Billy B. began to cry and told his mother what had happened. His mother called the police and an investigator came to the house and took a statement from Billy. Later that evening, Fresno police apprehended defendant, Tina Topping and Marlin Lewis, still in possession of the victim's car. The pistol that had been used to kill Ms. Greybeal was found in the car. Her watch was recovered from the jacket of Christina Menchaca, who was arrested nearby.

The foregoing account of the murder came primarily from Billy B. Other witnesses corroborated various portions of the testimony. Ms. Greybeal's father confirmed that she had left his residence on the evening of the murder to pick up some cigarettes at the K mart; she was driving her father's car, the vehicle in which defendant was later apprehended. He also testified that the victim owned two dogs. The officers who arrested defendant were called as witnesses, as well the officers who found the victim's body and examined the crime scene. A ballistics expert confirmed that the victim had been shot from a distance of six to twelve inches; an expended shell case found in the vicinity of the body was determined to have been fired from the gun recovered from the victim's car. The victim's handbag and an unlit cigarette were also found near the body. The coroner who performed the

autopsy confirmed that the victim had been killed by a single gunshot wound to the neck, severing the spinal cord and causing immediate paralysis and death.

Also introduced at the guilt phase were five yellow sheets of paper seized from defendant's cell during a routine search for contraband. The handwriting on the papers was identified as defendant's. The papers contained narrative scripts for Tina Topping, Marlin Lewis and Christina Menchaca indicating how the kidnapping, robbery and homicide had supposedly occurred. These fictional accounts blamed the killing on Lewis.

### B. *Penalty Phase*

At the penalty phase the prosecution offered evidence of eleven separate incidents involving the use or threat of violence by defendant, four of which occurred before the Greybeal homicide and seven after the homicide. The prior incidents were: (1) a robbery and assault on one George Key on April 24, 1973; (2) a high speed chase and exchange of gunfire with police following the Key incident; (3) an assault on an employee of the California Youth Authority on July 20, 1975; and (4) a scuffle with booking officers at the Sacramento County jail on April 18, 1977. The subsequent incidents included the kidnapping and robbery of one Jesus Miras on February 8, 1978, the same night as the Greybeal homicide, and six separate incidents that took place at San Quentin Prison in 1980 and 1982.

Defendant called four witnesses. Joe Walden, director of juvenile probation for the Fresno County Probation Department, testified that defendant had been abused as a child, that both his parents had served time in county jails and state prison, and that as a result defendant had been declared a dependent child and spent considerable time in Napa State Hospital and foster homes. Theresa Montgomery, an acquaintance of defendant's family, testified about the pervasiveness of drugs and alcohol and the lack of educational opportunities on the Indian reservation where defendant was raised. Counsel also read part of the prior testimony of Jean Shacklett, a parole investigator who interviewed defendant shortly after his arrest and observed marks on his arm indicating drug use. In addition, Glenn Davis, chaplain at the Fresno County jail, testified about his work with prison inmates and his prior counseling with defendant, and Don Penner, assistant district attorney for Fresno County, testified about his involvement with the church and his belief in the power of God to change a person's life. Defendant did not testify.

## II. GUILT ISSUES

### A. *Substitution of Counsel/Competence to Stand Trial*

Defendant contends the trial court lacked authority to grant a motion for substitution of counsel and subsequently failed to provide a meaningful competency hearing pursuant to the requirements of section 1368.[3] For the reasons that follow, we conclude the contentions lack merit.

An understanding of defendant's claims requires some review of the unique factual and legal circumstances in which they arose. In *Stankewitz I, supra,* 32 Cal.3d 80, we reversed the judgment from defendant's first trial on the ground the trial court erroneously failed to hold a competency hearing pursuant to section 1368. The underlying facts in *Stankewitz I* were as follows: Prior to trial, defendant's appointed counsel, a deputy public defender, informed the court that a fundamental dispute as to how the trial should proceed had developed between himself and defendant. Counsel indicated that he believed his client's position was irrational. The court, in response, appointed a psychiatrist, Dr. Glenn, to examine defendant for purposes of making a preliminary determination as to whether a full-scale competency hearing was required. After examining defendant, Dr. Glenn testified defendant appeared to harbor paranoid delusions that his public defender was in collusion with the prosecutor. Defendant's problem apparently stemmed in part from a fundamental dispute with the public defender over whether the defense should contest defendant's culpability as the perpetrator of the killing, or present a diminished capacity defense. Dr. Glenn stated that defendant appeared to be capable of cooperating in his own defense with an attorney who was not a public defender. (32 Cal.3d at pp. 87-88.)

Following Dr. Glenn's testimony, both defendant and the deputy public defender confirmed the fundamental nature of their dispute; defendant believed that the evidence was insufficient to prove he committed the offenses, and was unwilling to acquiesce in the public defender's diminished capacity defense. Defendant moved for a substitution of attorneys. The public defender did not join in the motion, but confirmed that he and defendant had reached an impasse and renewed his request for a full competency hearing. The trial court denied defendant's motion for substitution of attorneys and declined to order a hearing on the issue of defendant's competency. (*Stankewitz I, supra,* 32 Cal.3d at p. 89.) Defendant reiterated his dissatisfaction

---

[3] Section 1368 provides that when a doubt arises in the mind of the trial judge as to the mental competence of the defendant, the judge must suspend the proceedings for purposes of conducting a competency hearing.

with counsel and renewed his motion for substitution of attorneys on several occasions thereafter. On one occasion he even struck the public defender. Each request, however, was denied. (*Id.* at pp. 90-91.) The trial proceeded without further incident; defendant was convicted of all counts and sentenced to death.

As noted earlier, we reversed the judgment on the ground the trial court improperly failed to afford defendant a competency hearing after substantial evidence had been adduced that defendant could not rationally assist his public defender. (*Stankewitz I, supra,* 32 Cal.3d at p. 93.) In light of the peculiar interdependence of the competency and substitution of attorneys issues, however, we observed that a timely substitution of attorneys might well have obviated the need for a competency hearing. "In the particular circumstances of this case, a substitution of counsel might have avoided altogether the necessity for ordering a full competency hearing." (*Ibid.*) The trial court "had to take *some* action to unravel the fundamental dispute [between defendant and the deputy public defender] presented to it. The court may not have been required to hold a full competency hearing if the problem could have been resolved by a substitution of counsel. But the court should not have chosen to do nothing at all." (*Id.* at p. 94, italics added.) Since the court took no action in either direction, we were constrained to reverse. (*Ibid.*)

Thereafter, defendant was returned to Fresno County for retrial. The public defender was again appointed to represent him. Citing the same reasons voiced by counsel at the first trial, the assigned defender again expressed doubts as to defendant's competence to stand trial and the court, once again, suspended proceedings and pursuant to section 1368 appointed two psychiatrists, Drs. Glenn and Davis, to examine defendant. As he had done at his first trial, defendant immediately interposed a motion for substitution of counsel, citing a fundamental conflict of interest between himself and the public defender. The trial judge stated that he would deal with the motion after receiving the psychiatrists' reports and set both matters for a hearing three weeks hence.

The subsequent hearing commenced with the trial court explaining that defendant had refused to communicate with either of the two psychiatrists appointed to examine him. The deputy public defender nevertheless requested that the competency issue be set for trial. Defendant again objected, insisting that the public defender did not represent him and requesting a substitution of attorneys. The prosecutor then suggested that a *Marsden* hearing would be appropriate to examine the nature of the conflict between defendant and the public defender. (See *People* v. *Marsden, supra,* 2 Cal.3d 118.) The trial court agreed, observing that this court in *Stankewitz I, supra,*

32 Cal.3d 80, had stated that a substitution of counsel might have avoided altogether the necessity of ordering a full competency hearing. (*Id.* at p. 93.).

The hearing on defendant's motion for substitution of counsel commenced. Defendant restated his belief that the public defender was in collusion with the district attorney, that the public defender's insistence on presenting a diminished capacity defense was in direct conflict with defendant's position that he did not commit the crimes, and that defendant could not properly cooperate with and assist counsel in his own defense. The deputy public defender argued that the decision to present a diminished capacity defense was a tactical one for the attorney to make. Following this exchange, the trial court ordered an in camera hearing to examine the matter further. After doing so, the trial court made a finding of an irreconcilable conflict between the public defender and defendant, ordered the public defender relieved, and appointed private counsel (who was present in the courtroom) to represent defendant. At counsel's request, the court continued for two weeks the hearing on defendant's competence to stand trial.

At the outset of the continued competency hearing the court inquired of counsel whether he had decided to reschedule appointments with the court-appointed psychiatrists or whether he intended to proceed with the hearing on the existing evidence. Counsel thereupon objected to the hearing itself, insisting that no evidence had been adduced that defendant was incompetent. The court overruled the objection and again inquired of counsel whether he wished to submit the matter on the psychiatric reports of Drs. Glenn and Davis. Counsel noted that there was nothing in the reports, since defendant had refused to see the psychiatrists. The court acknowledged this but observed that it appeared to be of little moment, since the substitution of attorneys had essentially mooted the competency issue. Counsel thereupon agreed to submit the matter; defendant indicated that he concurred in counsel's decision. The court then ruled that defendant was competent and ordered the criminal proceedings reinstated.

■ Defendant now contends the trial court improperly granted his motion for substitution of attorneys before resolving the competency issue. We disagree. While it is true that section 1368 mandates the suspension of "all proceedings in the criminal prosecution" once the court has ordered a hearing into the mental competence of the defendant (§ 1368, subd. (c); see *People* v. *Marks* (1988) 45 Cal.3d 1335, 1340 [248 Cal.Rptr. 874, 756 P.2d 260]; *People* v. *Hale* (1988) 44 Cal.3d 531, 541 [104 Cal.Rptr. 705, 502 P.2d 513]), it is equally true that the Sixth Amendment right to effective representation virtually compels a hearing and an order granting a motion for substitution of counsel when "there is a sufficient showing that the

defendant's right to the assistance of counsel would be substantially impaired if [the defendant's] request was denied." (*People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513]; accord *People* v. *Burton* (1989) 48 Cal.3d 843, 855 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Moore* (1988) 47 Cal.3d 63, 76 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Smith* (1985) 38 Cal.3d 945, 956 [216 Cal.Rptr. 98, 702 P.2d 180]; *People* v. *Walker* (1976) 18 Cal.3d 232, 238 [133 Cal.Rptr. 520, 555 P.2d 306].)

Relying on *People* v. *Hale, supra,* 44 Cal.3d 531, and *People* v. *Marks, supra,* 45 Cal.3d 1335, defendant argues that the trial court lacked jurisdiction to act on his motion for substitution of counsel before it resolved the competency issue. In both of those cases, however, the trial court had expressed doubts as to the defendant's competence yet failed to hold a competency hearing and resolve the issue on the record. The omission required reversal in each case. (*Hale, supra,* 44 Cal.3d at pp. 541-542; *Marks, supra,* 45 Cal.3d at pp. 1340-1344.) As we explained in *Hale:* "[O]nce a doubt has arisen as to the competence of the defendant to stand trial, the trial court has no jurisdiction *to proceed with the case against the defendant* without first determining his competence in a section 1368 hearing, and the matter cannot be waived by defendant or his counsel." (44 Cal.3d at p. 541, italics added.)

The situation here is distinguishable. In the first place, the trial court did not reinstitute "the case against defendant" in merely entertaining defendant's substitution motion. (*People* v. *Hale, supra,* 44 Cal.3d at p. 541.) Furthermore, the court's response was amply justified if not indeed legally compelled. The trial court suspended the proceedings pursuant to section 1368 based on the evidence from the first trial that defendant harbored delusions of a conspiracy between the district attorney and the public defender. Immediately thereafter, the trial court was confronted with a motion for substitution of counsel by defendant based on an asserted fundamental conflict with the public defender. Relying on our statement in *Stankewitz I, supra,* 32 Cal.3d 80, that "a substitution of counsel might have avoided altogether the necessity for ordering a full competency hearing" (*id.* at p. 93), the trial court thereupon commenced a *Marsden* hearing to inquire into the nature of the asserted conflict. As the trial court correctly perceived, implicit in our holding in *Stankewitz I* was the assumption that while the trial court may not "proceed with the case against the defendant" before it determines his competence in a section 1368 hearing (*People* v. *Hale, supra,* 44 Cal.3d at p. 541), it may and indeed *must* promptly consider a motion for substitution of counsel when the right to effective assistance "would be substantially impaired" if his request were ignored. (*People* v. *Carr, supra,* 8 Cal.3d at p. 299.)

We thus conclude that the trial court properly considered defendant's motion for substitution of counsel before proceeding with the competency hearing. We also reject defendant's claim that he was denied a meaningful review at the subsequent competency hearing because the matter was submitted on the basis of the two appointed psychiatrists' reports indicating that defendant had refused to see them. The only evidence that defendant could not cooperate and assist in his defense was his delusion that the public defender was in collusion with the prosecutor.[4] This problem did not extend to other appointed counsel. Having resolved the substitution-of-attorney issue by appointing private counsel, the competency issue was essentially moot. The trial court cannot be faulted for choosing, out of an apparent abundance of caution, to proceed with the competency hearing, allowing the matter to be submitted and finding defendant competent for the record.

Contrary to defendant's contention, moreover, permitting the matter to be submitted on the record of defendant's refusal to communicate with the court-appointed psychiatrists is not tantamount to the absence of a hearing or a waiver by counsel. (See *People* v. *Maxwell* (1981) 115 Cal.App.3d 807, 812 [171 Cal.Rptr. 579] ["The fact that neither party chose to present evidence on the [competency] issue does not point to the absence of a hearing."]; accord *People* v. *Marks, supra,* 45 Cal.3d at pp. 1342-1343; see also § 1369, subd. (b)(2) ["If the defense declines to offer any evidence in support of the allegation of mental incompetence, the prosecution may do so."].)[5] Nor, obviously, did counsel's decision to submit an essentially moot question deprive defendant of the effective assistance of counsel.

Defendant's final contention in this regard is that he was denied his constitutional right to due process under section 1369, subdivision (f), which states that it shall be "presumed that the defendant is mentally competent unless it is proved by a preponderance of evidence that the defendant is mentally incompetent." Once the defendant has offered some evidence of incompetence, he argues, the burden of proving competence should shift to the prosecution.

---

[4] At oral argument, counsel suggested there was evidence that defendant was incompetent to stand trial regardless of who was representing him. Dr. Glenn's testimony at the first competence hearing does not support the contention. Dr. Glenn stated that defendant's "paranoid feelings" were "related specifically to the Public Defender." He denied that there was "anything in [his] examination [of defendant] which would indicate that [defendant] would . . . develop the same paranoid feelings against" private counsel. He stated unequivocally: "I would feel that he could cooperate with a private attorney."

[5] This is not to suggest that the trial court's competency determination under section 1368 is necessarily confined to the experts' interviews with the defendant. Even where the defendant refuses to be interviewed, the court-appointed experts may testify as to their observations of the defendant, and the trial court may consider other evidence, including its own observations and the defendant's in-court demeanor.

Defendant overlooks the fact, however, that once the trial court ordered the substitution of counsel, whatever scintilla of evidence there was of incompetency became irrelevant; there was no evidence that defendant was delusional with respect to any attorney other than the public defender. Accordingly, we need not and therefore expressly decline to address defendant's constitutional claim. (*Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424]; accord *People v. Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].)

### B. *Accomplice Instructions*

The jury was instructed to determine whether Billy B., the principal prosecution witness, was an accomplice (CALJIC No. 3.19) and was told that if they made such a finding his testimony should be viewed with distrust (CALJIC No. 3.19) and would have to be corroborated by evidence tending to connect defendant with commission of the offense charged. (CALJIC Nos. 3.11, 3.12.) ■ The trial court denied defendant's request to remove the issue from the jury by instructing that Billy was an accomplice as a matter of law (CALJIC No. 3.16). Defendant contends that denial was reversible error.

■ Section 1111 defines as accomplice as a person "who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." This definition encompasses all principals to the crime (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]), including aiders and abettors and coconspirators. (*People v. Gordon* (1973) 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298].) ■ Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom. (*People v. McLain* (1988) 46 Cal.3d 97, 106 [249 Cal.Rptr. 630, 757 P.2d 569]; *People v. Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760].)

■ The fact that a witness has been charged or held to answer for the same crimes as the defendant and then has been granted immunity does not necessarily establish that he or she is an accomplice. (*People v. Garrison* (1989) 47 Cal.3d 746, 772 [254 Cal.Rptr. 257, 765 P.2d 419]; *People v. Tewksbury, supra,* 15 Cal.3d at p. 960.) Nor is an individual's presence at the scene of a crime or failure to prevent its commission sufficient to establish aiding and abetting. (*People v. Harris* (1985) 175 Cal.App.3d 944, 954 [221 Cal.Rptr. 321]; *People v. Gibson* (1976) 56 Cal.App.3d 119, 131 [128 Cal.Rptr. 302].) Indeed, as we explained in *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]: "[T]he weight of authority and sound law require proof that an aider and abettor act with

knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (Original italics; accord *People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392].)

■ Defendant argues that Billy B.'s testimony plainly established his liability as an accomplice to the kidnapping, robbery and murder. We disagree. Billy's testimony indicated that his involvement in the these events was extremely limited; he was present when the others planned the kidnapping and he obeyed Tina Topping's directions to get into the car after the abduction; he was aware defendant had a pistol and Marlin Lewis had a knife; he remained in the car with the victim and Lewis while the others went into the Olympic Hotel; and he followed Topping's order to give a false name to two police officers when they questioned the group outside the Seven Seas Bar.

At most, the foregoing evidence demonstrates that Billy B. was present during the planning and execution of the offenses and failed to prevent their commission. That is not sufficient to establish aiding and abetting. (*People* v. *Harris, supra,* 175 Cal.App.3d at p. 954.) Furthermore, Billy consistently denied any intent to facilitate the crimes—an essential element of accomplice liability. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 194 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)[6]

Defendant nevertheless insists the evidence indicates that Billy B. intentionally aided the criminal enterprise by preventing the victim from escaping when she was left alone with Billy and Marlin Lewis outside the Olympic Hotel; he contends that Billy was the only one in possession of a weapon at the time. The record does not support the claim. Billy testified that at no time did he ever have a weapon in his possession, threaten the victim, or do anything to keep her in the car. "[W]here the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witness' liability for prosecution is a question for the jury." (*People* v. *Gordon, supra,* 10 Cal.3d at p. 467.) The trial court in this matter could not have instructed that Billy was an accomplice as a matter of law without indicating to the jury the court's belief that Billy had testified falsely. (*People* v. *Garrison, supra,* 47

---

[6] Billy testified that charges were filed against him in connection with the kidnapping and murder, and that he was subsequently granted immunity in return for his testimony. Defendant does not contend, nor does the law provide, that these facts establish Billy's status as an accomplice as a matter of law. (*People* v. *Garrison, supra,* 47 Cal.3d at p. 772.)

Cal.3d at p. 772.) Accordingly, the question of Billy's status as an accomplice was a factual one properly submitted to the jury.[7]

Defendant advances as an alternative basis of error the trial court's instruction to the jury that defendant "has the burden of proving by a preponderance of the evidence that [Billy B.] was an accomplice in *the crimes* charged against the defendant." (CALJIC No. 3.19.) Defendant argues the jury may have been misled by the underscored language to believe that defendant must prove Billy was an accomplice as to each and every offense charged.

It is an interesting theoretical point but one that we need not address in this case, as the instruction complained of could not have prejudiced defendant. As noted earlier, the evidence indicated that Billy B. was not an accomplice as to any of the offenses charged against defendant. The uncontradicted evidence showed at most that Billy was present during the planning of the theft of the car and took no action to prevent its occurrence. Indeed, the evidence indicated that Billy initially was not present when the car was commandeered, started to walk away when he saw it had been, and only reluctantly got into the car at Tina Topping's insistence. There was no evidence that Billy gave any meaningful assistance to defendant in the commission of any of the crimes or that he intended to encourage or facilitate their execution. (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560; *People* v. *Croy, supra,* 41 Cal.3d at pp. 11-12.) Accordingly, the instruction as given could not have prejudiced defendant. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 762 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant also finds fault with that portion of CALJIC No. 3.19 which states: "In the event that the *defendant has not proved* by a preponderance of the evidence that Billy . . . was an accomplice or the evidence is evenly balanced so that you are unable to say that the evidence on either side of the issue outweighs the other, then you must find that Billy . . . was not an accomplice." (Italics added.) Defendant asserts the jury may have been

---

[7]Nothing in the trial transcript indicates that Billy was ever in possession of a weapon during the incident. Defendant cites Billy's testimony at defendant's preliminary hearing that after Marlin Lewis put the knife away, it ended up "between my legs." That testimony could not have affected the trial court's decision, however, since the court must instruct pursuant to the evidence presented at trial. Moreover, the fact that the knife was later hidden under Billy's legs did not demonstrate as a matter of law that he intended to or did facilitate the commission of any of the crimes. (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.) Nor was Billy's preliminary hearing testimony—which suggested that Marlin Lewis hid the knife under Billy's legs—necessarily inconsistent with Billy's trial testimony that he never had a weapon in his possession. The evidence certainly does not support defendant's claim at oral argument that the prosecutor presented false evidence at trial (*People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341]) or that counsel rendered constitutionally ineffective assistance by failing to impeach Billy's testimony. (See the discussion, *post,* at p. 113.)

misled because they were not informed that a defendant is relieved of the burden of producing evidence when *the prosecution* presents evidence showing that a witness is an accomplice. (*People* v. *Belton* (1979) 23 Cal.3d 516, 524 [153 Cal.Rptr. 195, 591 P.2d 485].)

The latter part of the instruction, "or the evidence is evenly balanced," would have indicated to the jury that evidence produced by either party was to be considered. However, having failed to request amplification of the standard instruction defendant cannot now be heard to complain of any alleged deficiency. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].) Moreover, we do not perceive how such an amplification could have assisted defendant. As noted earlier, neither the defense nor the prosecution adduced any substantial evidence from which it could reasonably be inferred that Billy B. assisted in the commission of the offenses and shared defendant's criminal purpose.

■ Finally, defendant notes that at his first trial the jury was instructed that Billy B. was an accomplice as a matter of law; he contends the trial court in this case was bound by that earlier determination. The contention plainly lacks merit. The issue was not governed by law of the case, as we did not rule on the propriety of the accomplice instruction in *Stankewitz I, supra,* 32 Cal.3d 80. Also, the trial court is not bound by evidentiary rulings or instructions in prior proceedings. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Williams* (1988) 44 Cal.3d 883, 912 [245 Cal.Rptr. 336, 751 P.2d 395].) Defendant claims that *People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384] supports his position; we are unable to discern how that case, holding the People are entitled to review of an adverse ruling on a *Miranda* issue (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), is relevant.

In sum, the trial court properly instructed the jury on their duty to determine whether Billy B. was an accomplice.

C. *Instruction on Oral Admissions*

■ Defendant next correctly asserts that the trial court erred in failing to instruct sua sponte that evidence of oral admissions should be viewed with caution. (CALJIC Nos. 2.71, 2.71.7.) These instructions would have been applicable to Billy B.'s testimony that following the shooting defendant said to Marlin Lewis, "Did I drop her or did I drop her?"[8] The prosecu-

---

[8] Defendant asserts the omitted instructions would also have applied to Billy's testimony that, in response to the victim's assertion the kidnapping would never have occurred if she had her dog, defendant brandished a pistol and stated: "This [i.e., the gun] would have took

tion cited this statement during closing argument as evidence the killing was wilful, deliberate and premeditated.

In *People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1], we held the trial court must instruct sua sponte that "evidence of oral admissions must be viewed with caution . . . ." Under *Beagle*, the court's failure in this case to so instruct was error. The error, however, was not prejudicial. As we explained in *Beagle*: "The omission . . . does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (*Ibid.*) In assessing potential prejudice, we stressed that the primary purpose of the cautionary instruction "is to assist the jury in determining if the statement was in fact made." (*Id.* at p. 456.)

Applying these principles to the case at hand, we are persuaded there is no reasonable probability the jury would have reached a different result absent the error. The testimony concerning defendant's oral admission was uncontradicted; defendant adduced no evidence that the statement was not made, was fabricated, or was inaccurately remembered or reported. There was no conflicting testimony concerning the precise words used, their context or their meaning. (See *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1224-1225 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Beagle, supra,* 6 Cal.3d at p. 456.) Furthermore, as discussed earlier, the jury was properly instructed as to how they should treat the testimony of an accomplice, if they determined that Billy B. was an accomplice. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1315 [248 Cal.Rptr. 834, 756 P.2d 221].) Accordingly, we are persuaded that a result more favorable to defendant was not a reasonable probability absent the instructional error.

### D. *Shackling of Defendant*

Defendant next contends the trial court erred prejudicially in failing promptly to conduct a hearing on the necessity of his placement in leg restraints, and further erred in concluding there was a manifest need for such action.

Because of its potentially prejudicial impact on the jury, shackling is to be employed only as a last resort, based on "a showing of manifest need

care of the dog." It is not altogether clear that this statement constitutes an admission. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620] ["[A]n admission is . . . the recital of facts tending to establish guilt . . . ."].) In any event we are persuaded that the court's failure to instruct sua sponte on evidence of oral admissions was harmless.

for such restraints." (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 945 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Hamilton* (1985) 41 Cal.3d 408, 423 [221 Cal.Rptr. 902, 710 P.2d 981]; *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) Where restraints are used, they "should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*People* v. *Duran, supra,* 16 Cal.3d at p. 291.) The defendant, however, must object to the use of physical restraints or the claim will be deemed waived on appeal. (*People* v. *Walker* (1988) 47 Cal.3d 605, 629 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Duran, supra,* 16 Cal.3d at p. 289; *People* v. *Chacon* (1968) 69 Cal.2d 765, 778 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) Furthermore, the court's "shackling decision 'cannot be successfully challenged on review except on a showing of a manifest abuse of discretion.' " (*People* v. *Sheldon, supra,* 48 Cal.3d at p. 945, quoting *People* v. *Duran, supra,* 16 Cal.3d at p. 293, fn. 12.)

■ When reviewed in light of these principles, it is clear that defendant's claim lacks merit. Defendant was apparently placed in leg restraints at the outset of the jury selection process. The record discloses that no hearing was held on the necessity of the restraints until the 14th day of voir dire; the record also discloses no objection to the restraints or request for a hearing during that time.[9] The court began the hearing by describing the procedures the court had followed to that point: "Since these proceedings began, leg restraints have been on the defendant. That is, they are like handcuffs above his ankles, and there is a one and a half foot-long chain between the cuffs. These have been out of view of the prospective jurors. The defendant has been brought into court before any prospective jurors and he is—he leaves the court after all the prospective jurors are gone. He has not been handcuffed in court nor have any other restraints been used."

The court then explained that it had imposed the shackles at the request of court security; the court was advised that during his first trial defendant had attempted to escape from his holding cell in the courthouse, had struck his attorney and had threatened the trial judge. The court then heard testimony from the bailiff in charge of court security, who stated that he believed there was a continuing need for restraints based on defendant's

---

[9] Up until the hearing, the only reference to the restraints came during a prolonged outburst by defendant against what he perceived to be a general bias in the jury selection process. At one point defendant stated: "What the hell the leg irons on me for, man? That's something you could change . . . . Why is this on me? These ain't supposed to be on me. I ain't no damn dog. Be fair . . . ." A hearing on the need for restraints was held several days later. Even assuming that the foregoing constitutes a cognizable objection, defendant has adduced no evidence that the court's delay of several days in conducting the hearing resulted in any possible prejudice.

behavior during his first trial, as well as recent reports from jail personnel indicating that defendant had expressed plans to escape.

The trial court concluded there was a manifest need for restraints but ordered that the shackles be replaced by a leg brace which apparently could be placed under defendant's pants. When defendant later complained that the brace caused severe discomfort the court reimposed the original shackles.

The trial judge held a second hearing on the need for leg restraints at the conclusion of voir dire, explaining that he had asked the sheriff's department to reassess the need for restraints with a view to the least visible and restrictive options available.[10] " The chief bailiff testified that he believed defendant posed a continuing security risk and recommended that defendant remain shackled. In support of this conclusion he cited defendant's prior violence and escape attempt, as well as a more recent incident; several days earlier, he testified, sheriff's deputies had overheard defendant threaten to steal a gun if he could and shoot the officers. One of the officers in question confirmed that he had overheard defendant "state that the officers better not slip, quote, unquote, and that if he had the chance he would take a gun and shoot the officers." The People also introduced evidence of several recent incidents involving threats and assaults by defendant against other inmates while incarcerated in San Quentin Prison.

Based on the foregoing, the trial court found there had been "a clear showing that there is a manifest need for restraints to minimize the defendant's opportunity to escape and minimize the likelihood of courtroom violence." The judge noted that the jury was not aware of the restraints, that the "makeup of the courtroom is such that they can't see them," and that defendant "would be brought in before and taken out after the jury leaves." The trial proceeded without further incident.

On this record, we conclude that the trial court's decision to impose leg restraints did not constitute a "manifest abuse of discretion." (*People* v. *Duran, supra,* 16 Cal.3d at p. 293, fn. 12.) The trial court conducted not one but two special hearings to determine the need for restraints, carefully considered the evidence of defendant's prior violence and escape attempt as

---

[10]Defendant continued to object to the shackles throughout the remainder of voir dire. Though he repeatedly denied that he constituted a threat, his statements actually contained numerous threats, both veiled and overt, directed against the trial judge and bailiffs. One such exchange, not untypical, was as follows:

"The Court: You just sat there and threatened to throw your shoe at me.

"Defendant: I'll threaten you again. I would do more than that if I had the mother fucking opportunity . . . ."

well as more recent threats against the court and bailiffs, and imposed the least visible or obtrusive restraints available outside the presence of the jury. Accordingly, we find no abuse of discretion.

### E. *Admission of Writings Seized From Defendant's Cell*

■ Defendant next contends the trial court erred in admitting certain writings seized[11] from his cell, and compounded the error by instructing that such writings could be considered as a circumstance tending to show consciousness of guilt. The contention is without merit.

The evidence in question consisted of five yellow sheets of paper with writing on both sides. The pages had been removed from defendant's cell during a routine search for contraband. A forensic expert identified the handwriting as defendant's. The papers contain what appear to be fictional first person narratives scripted for Tina Topping, Marlin Lewis, and Christina Menchaca, describing the events surrounding the murder and attributing the killing to Marlin Lewis. During closing argument, the prosecutor referred to the writings twice, briefly, as "scripts" prepared by defendant to place blame for the killing on Marlin Lewis. The trial court instructed the jury, pursuant to CALJIC No. 2.04: "If you find that a defendant attempted to persuade a witness to testify falsely or tried to fabricate evidence to be produced at trial, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such attempt is not sufficient to prove guilt, and its weight and significance, if any, are matters for your determination."

The People note that trial counsel failed to object to either the evidence or the prosecutor's argument concerning the evidence; accordingly, the issue is waived on appeal. (*People* v. *Sheldon, supra,* 48 Cal.3d at p. 951; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal. Rptr 1, 609 P.2d 468].)[12] Moreover, defendant has not shown that the evidence was improperly admitted. Defendant contends the writings were inadmissible and the instruction was improper because the prosecution adduced no foundational evidence that defendant had attempted to persuade Marlin Lewis, Tina Topping or Christina Menchaca to testify in accordance with the fictionalized

---

[11] The writings were removed from defendant's cell in a "wadded up" condition during a routine search for contraband. Defendant does not allege that the writings were improperly seized, and has never moved to suppress the evidence on that basis.

[12] In a footnote to his brief, defendant characterizes trial counsel's failure to object as incompetence but fails to argue—much less demonstrate—that counsel's omission deprived defendant of a meritorious defense or substantially affected the outcome of the trial. (*People* v. *Sheldon, supra,* 48 Cal.3d at p. 951; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

scenarios set forth in his notes. It is reasonable to infer, however, that defendant prepared the false scenarios precisely for this purpose. We conclude therefore that the trial court committed no error in admitting the writings. The cases cited by defendant, *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203] and *People* v. *Weiss* (1958) 50 Cal.2d 535 [327 P.2d 527], are inapposite. These decisions were concerned with alleged efforts by *third parties* to suppress evidence at trial; because of the absence of evidence of authorization by the defendants, we held the instruction on fabrication to have been erroneous. (*People* v. *Hannon, supra,* 19 Cal.3d at p. 599; *People* v. *Weiss, supra,* 50 Cal.2d at pp. 553-554.) No such third party issue was present here.

Defendant also contends the unqualified reference to "consciousness of guilt" in CALJIC No. 2.04 was overbroad, as evidence of an attempt to fabricate evidence has no direct bearing on premeditation or deliberation. The jury was properly instructed, however, that the "weight and significance, if any," to be accorded such evidence was for the jury's determination. We discern no reasonable probability the jury was misled into giving undue weight to the evidence in question.

## F. *Instruction on Aiding and Abetting*

 Defendant contends the trial court committed prejudicial error by instructing the jury on aiding and abetting with respect to the robbery. The contention is without merit.

The prosecutor in closing argument urged the jury to convict defendant of robbery on either of two theories, as a direct participant in the robbery of the victim's car, money and watch, or as an aider and abettor in the offense. The court subsequently instructed the jury on aiding and abetting in the language of former CALJIC Nos. 3.00 and 3.01.[13] In *People* v. *Beeman, supra,* 35 Cal.3d 547, we held these instructions to be erroneous because they did not advise the jury that conviction as an aider and abettor required not only that the defendant have knowledge of the criminal purpose of the perpetrator of the offense, but also that the defendant share that purpose or intend to commit, encourage, or facilitate the commission of the crime. (*Id.* at p. 560; see *People* v. *Croy, supra,* 41 Cal.3d at pp. 11-12.)

The record clearly demonstrates, however, that this is a case in which "the *Beeman* error could not possibly have affected the verdict." (*People* v.

---

[13] "Those who, with knowledge of the unlawful purpose of the person who directly and actively commits the crime, aids and abets in its commission."

"A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages, or instigates by act or advice the commission of such crime."

*Leach* (1985) 41 Cal.3d 92, 105 [221 Cal.Rptr. 826, 710 P.2d 893].) The evidence showed that defendant was a principal in the robbery of the victim's car, and actively participated in the attempted sale of the victim's watch. Furthermore, the jury specifically found that defendant personally used a firearm in the commission of the robbery. By finding the firearm-use allegation to be true, the jury impliedly found that defendant was a direct participant, or, at a minimum, that he aided the robbery with the requisite intent. (See *People* v. *Bean* (1988) 46 Cal.3d 919, 949-950 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Leach, supra,* 41 Cal.3d at pp. 105-106.) We find no reversible error.

In a related vein, defendant also contends the *Beeman* error tainted the murder conviction and the robbery-murder special-circumstance finding. This contention lacks merit, as well. Although the prosecutor argued felony murder as an alternative theory and the jury was instructed on felony murder and implied malice (CALJIC Nos. 8.11, 8.21, 8.79), the uncontradicted evidence showed that defendant personally and with cold-blooded deliberation shot the victim, and the People tried the case primarily on the theory that the murder was wilful, deliberate and premeditated. In accord with the 1977 death penalty statute under which defendant was tried, the jury was instructed that in order to find the robbery-murder special circumstance true, it must find that "the murder was wilful, deliberate and premeditated, and . . . that defendant with the intent to cause death, physically committed the act causing death; and that the murder was committed during the commission or attempted commission of a robbery." The jury returned a verdict specifically finding that the murder was wilful, deliberate and premeditated, that defendant personally used a firearm during the commission of the offense, and that the murder was personally committed by defendant during the commission of a robbery. The record and the verdict thus clearly demonstrate that the aiding and abetting instructions could not possibly have affected the judgment. (*People* v. *Leach, supra,* 41 Cal.3d at p. 105.)

### G. *Unanimity Instruction*

Defendant next asserts the trial court was obligated to instruct the jury sua sponte pursuant to CALJIC No. 17.01 that before finding defendant guilty of robbery the jurors had to agree unanimously on the act or acts which formed the basis of the conviction.[14] (See *People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].)

---

[14] CALJIC No. 17.01 provides in pertinent part: "The defendant . . . may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of the [acts constituting the crime with which he is charged], but in order to find the defendant guilty, all jurors must agree that he committed the same act or acts."

■ The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]; *People* v. *Diedrich, supra,* 31 Cal.3d at p. 282.) The "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. (*People* v. *Crandell, supra,* 46 Cal.3d at p. 875.)

The evidence, as will be recalled, showed that defendant planned and participated in the kidnapping and forcible taking of the victim's vehicle. Once in the car, defendant produced a gun and threatened the victim with it. Tina Topping then demanded money from the victim, who handed $32 to Marlin Lewis. The victim also gave her watch to Topping with the comment that her insurance would cover it.

Based on the foregoing record evidence, defendant contends a unanimity instruction was required because the jury could have concluded (1) that the victim's money and watch were not taken by means of force or fear, or (2) that in any event the defendant was not responsible for either taking.

Assuming arguendo that a unanimity instruction would have been appropriate under the circumstances, we conclude that no prejudice resulted from the court's failure to so instruct. (*People* v. *Crandell, supra,* 46 Cal.3d at pp. 874-875.) The prosecutor argued, and the evidence demonstrated beyond a reasonable doubt, that defendant was guilty of robbery with respect to each of the items of personal property taken from the victim. After forcibly commandeering her car, defendant threatened the victim with a handgun. Though the subsequent demand for money came from Tina Topping, and the victim apparently relinquished her watch without any explicit demand, the inference is inescapable that both takings were accomplished by means of the implicit threat of force or fear presented by defendant's gun.

Whatever slight differences inhered in the defenses offered by defendant to the takings of the victim's car, watch and money were thus without significance. We conclude that no prejudice resulted from the omission of a unanimity instruction.

H. *Sufficiency of the Evidence of Felony Murder*

Defendant next contends the murder conviction and the robbery-murder special-circumstance finding are defective because the robbery terminated as a matter of law before the killing. The contention is without merit.

As to the murder conviction, defendant overlooks the fact that he was tried primarily on a theory of wilful, deliberate and premeditated first degree murder, and the jury specifically found, in connection with both the robbery-murder and kidnapping-murder special-circumstance allegations, that the murder was wilful, deliberate and premeditated and was personally committed by defendant. The murder conviction, therefore, is valid regardless of the merits of the felony-murder theory.

■ As to the robbery-murder special circumstance, defendant contends the murder could not have been committed during the commission or attempted commission of a robbery because he had reached a "place of temporary safety" (*People* v. *Salas* (1972) 7 Cal.3d 812, 821-823 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]) at one of at least several points prior to the killing, and therefore the robbery had necessarily terminated before the killing. More specifically, defendant argues that his flight after the kidnapping and robbery ended soon after he and his associates left the K mart parking lot and reached the freeway. Alternatively, defendant contends that the continuity between the robbery, the escape, and the killing was broken by the intervening stops at the Joy and Joy Bar and the Olympic Hotel.

The contention lacks merit. So long as he held the robbery and kidnapping victim, defendant's safety was continuously in jeopardy. At any point in the journey, at any one of the several stops the group made between the K mart and the killing scene, in any unguarded moment, the victim might have managed to escape or signal for help. (See *People* v. *Fields* (1983) 35 Cal.3d 329, 367 [197 Cal.Rptr. 803, 673 P.2d 680].) There was never a moment when defendant could reasonably be said to have reached a place of temporary safety. Defendant exercised continuous "control" over the victim from the beginning of the episode to its tragic fatal conclusion. (*Id.* at p. 368.) The crimes were also linked by the fact that defendant's motive for killing may have been to prevent the victim of the robbery and kidnapping from identifying him. (*Ibid.*)

*People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132], which defendant cites as controlling, is clearly distinguishable. In that case, "many hours" had elapsed between the robbery and the killing, and the defendant had reached several havens of temporary safety during that period; furthermore, the robbery victim was not the person who was killed. (*Id.* at pp. 56-57.) Here, by way of contrast, only two to three hours elapsed from the abduction and robbery to the killing, the defendant made only two brief stops, the robbery victim was also the murder victim, and the apparent motive for the killing was to prevent the victim from identifying defendant as the perpetrator of the original crimes.

Thus, the evidence amply supports the special circumstance finding of murder during the commission of a robbery.

Defendant also renews a contention from his first appeal concerning the trial court's refusal to give a special instruction on the duration of robbery. Inasmuch as the request was not made in the retrial, and the trial court properly instructed the jury on the law governing the duration of a robbery (CALJIC No. 9.15), the contention must be rejected.

### I. *Comment on Unavailability of Witnesses*

Defendant asserts the trial court improperly sustained a prosecution objection to a comment by defense counsel during closing argument. The contention lacks merit.

During closing argument, defense counsel observed the prosecution had called only one witness to the shooting, Billy B., despite the fact that there were at least three other potential witnesses, Tina Topping, Christina Menchaca and Marlin Lewis. Counsel then observed: "And I think that the fact that those people are absent when they are available is something that you should give great consideration to." The prosecutor objected to the statement, noting that there was no evidence in the record indicating the witnesses were available. The trial court sustained the objection. Counsel then stated more accurately: "There's no showing on the basis of the evidence that any of those people are unavailable. And no reason has been given for their not being here." Thereafter, in rebuttal, the prosecutor suggested that perhaps Menchaca, Lewis and Topping had not testified because "maybe they don't want to be in a position where they testify against [defendant] . . . ." Counsel's objection to this statement was overruled.

The prosecutor's objection was properly sustained. Nothing in the record indicated whether Christina Menchaca, Tina Topping or Marlin Lewis were available. ▌ It is axiomatic that counsel may not state or assume facts in argument that are not in evidence. Defendant's reliance on *People* v. *Ford* (1988) 45 Cal.3d 431 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785] is misplaced. There, we held that a codefendant who has not actually exercised his privilege against self-incrimination is not unavailable and therefore the prosecutor did not err in commenting on defendant's failure to call several codefendants who might have substantiated his alibi defense. *Ford* does not, however, permit the prosecutor or defense counsel to state as a fact that a codefendant is available as a witness when there is no evidence to substantiate the statement.

Defendant also contends the trial court erred in overruling counsel's objection to the prosecutor's comment that "maybe they [i.e., Marlin Lewis,

Christina Menchaca and Tina Topping] don't want to be in a position where they testify against [defendant]." Defendant asserts the prosecutor improperly implied that Menchaca, Topping, and Lewis did not testify because they were afraid of defendant. The statement was ambiguous; it could just as easily have implied that Topping, Menchaca, and Lewis did not wish to testify against defendant because he was a friend. In any event, though we agree the prosecutor's remark was unsupported by the record evidence, we cannot conceive of how so brief and tangential a comment could have affected the verdict.

## J. Denial of Challenges for Cause

Defendant contends the trial court erroneously overruled challenges for cause that he made with respect to eight prospective jurors, one that he claims was impliedly biased and the other seven that he claims would automatically vote for the death penalty and therefore should have been excused under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. The contention is unavailing.

Even assuming arguendo that the trial court erroneously disallowed his challenges for cause, defendant cannot demonstrate prejudice for no objectionable juror was forced on him as the result of the assumed error; defendant exercised peremptory challenges against Nichols, the allegedly biased juror, as well as against four of the seven jurors who were allegedly disqualified under the *Witt/Witherspoon* standards. He failed to excuse the other three jurors in question notwithstanding the fact that he had three peremptory challenges remaining which he never exercised. ■ It is well settled that a defendant cannot complain an objectionable juror was forced on him where he could have exercised a peremptory challenge. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 770-771 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Miller* (1969) 71 Cal.2d 459, 473 [78 Cal.Rptr. 449, 455 P.2d 377]; *People* v. *Wilkes* (1955) 44 Cal.2d 679, 686 [284 P.2d 481].)

■ Furthermore, our review of the record discloses that although several of the prospective jurors expressed a preference, under certain circumstances, for the death penalty, they ultimately confirmed that they would follow the court's instructions and keep an open mind concerning life imprisonment as an alternative to the death penalty. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 618-619 [244 Cal.Rptr. 200, 749 P.2d 854].) Where conflicting responses are elicited on voir dire, a trial court's determination of impartiality is generally binding on review. (*Id.* at p. 619; *People* v. *Fields, supra,* 35 Cal.3d at p. 356.) The trial court here did not err in refusing to excuse for cause the prospective jurors in question.

### K. *Death Qualification of the Jury*

Defendant contends he was denied his state and federal constitutional rights to a fair and impartial jury as a result of the death-qualifying voir dire of the jury. In *Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-183 [90 L.Ed.2d 137, 147-154, 106 S.Ct. 1758], the United States Supreme Court concluded that "death qualification" does not violate a criminal defendant's constitutional right to a fair and impartial jury. We have similarly concluded that death qualification does not violate the analogous state constitutional guaranty, and the record here contains no evidence to support the claim or cause us to reconsider the question. (*People* v. *Bean, supra,* 46 Cal.3d at p. 956.)

Defendant further contends he was denied his Sixth Amendment right to a representative jury as a result of the death qualification. The United States Supreme Court has rejected this contention in *Lockhart* v. *McCree, supra,* 476 U.S. at pages 173-177 [90 L.Ed.2d at pages 147-150], and we rejected it in *People* v. *Fields, supra,* 35 Cal.3d at pages 342-353. Defendant has advanced no arguments that cause us to reconsider our decision.

### L. *Intent to Permanently Deprive*

Billy B. testified that at some point during the kidnapping, defendant, referring to the victim, stated: "[W]henever we get back to Fresno, we're going to let her go back up there." Based on this, defendant asserts the victim's car may have been taken with the intent to temporarily deprive her of possession of the car rather than the specific intent to steal. Therefore, he contends the trial court was required to instruct the jury sua sponte that a conviction of robbery could not be based on the taking of the car if the intent to steal, as opposed to an intent to temporarily deprive, did not arise until *after* the shooting. The contention lacks merit.

The jury was specifically instructed on the elements of robbery, including the requirement that the taking be "accomplished by means of force or fear, and with a specific intent permanently to deprive the owner of his property." (CALJIC No. 9.10.) The court further instructed with respect to felony murder that the killing must have been "committed during the commission of or attempt to commit the crime of a robbery" (CALJIC No. 8.21) and informed the jury that it could not find defendant guilty of felony murder "as the result of the commission or attempted commission of robbery . . . if at the time of the commission or attempt to commit such crime, the defendant did not form the specific intent to commit such crime." (CALJIC No. 8.79.) Similar instructions were given in connection with the robbery-murder special circumstance.

The jury was therefore specifically apprised of the requirement that defendant must have formed the specific intent to commit robbery. No further amplifying instruction was requested, and none was required.

### M. *Alleged Wheeler Error*

During voir dire, the prosecutor exercised a peremptory challenge against a prospective juror named Moreno. Defendant now contends the prosecutor improperly excused Ms. Moreno, a Native American, solely for racial reasons.

In *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], we ruled that peremptory challenges may not be used to exclude from a jury, solely because of a presumed "group bias," any member of an identifiable group of citizens distinguished on racial, religious, ethnic or similar grounds. (See also *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People* v. *Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452].) Under *Wheeler*, if a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and "make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (22 Cal.3d at p. 280, fn. omitted; accord *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 93-100 [90 L.Ed.2d at pp. 85-90].)

Defendant's contention that Ms. Moreno was excluded solely because of her ethnic heritage founders on the threshold *Wheeler* requirement of a timely objection. Defendant raised no *Wheeler* objection to the prosecutor's use of his peremptory challenge against Ms. Moreno, notwithstanding the fact that defense counsel had earlier observed Ms. Moreno was a Native American. Accordingly, the record is barren for purposes of review. Because there was no objection and no effort to establish a prima facie case of discrimination, the prosecutor was never asked to justify and explain his use of a peremptory challenge against Ms. Moreno on grounds unrelated to group bias. Accordingly, we cannot conclude that the peremptory challenge violated defendant's rights under *Wheeler*. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 231-232 [233 Cal.Rptr. 404, 729 P.2d 839].)

## III. Penalty Issues

### A. *Issues Relating to Evidence of Uncharged Criminal Activity*

During the penalty phase, the prosecution introduced evidence of 11 separate incidents involving the use or threat of violence by defendant, pursuant to section 190.3, factor (b).

1. Defendant first contends the admission of evidence of unadjudicated criminal activities committed by defendant violated his constitutional rights under the Fifth and Eighth Amendments. Defendant raised no constitutional objection to the admission of the evidence at trial. Furthermore, we have previously rejected similar or identical claims. (See *People v. Balderas, supra,* 41 Cal.3d at p. 205; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) Defendant has presented us with no persuasive reason to depart from our prior holdings.

2. Defendant further contends the court erred in failing to instruct sua sponte that the jury must unanimously agree the unadjudicated offenses were proved beyond a reasonable doubt. We rejected this claim in *People v. Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]. We discern no persuasive reason to reconsider it here.

3. Defendant next contends the court erred by instructing the jury on aiding and abetting in terms of the pre-*Beeman* (*People v. Beeman, supra,* 35 Cal.3d 547) version of CALJIC Nos. 3.00 and 3.01. He contends the error was prejudicial as applied to two of the unadjudicated offenses. Jesus Miras testified that sometime after the victim in this matter was abducted and killed, he was lured by Christina Menchaca to a car containing two men and two women (which would correspond with Tina Topping, Menchaca, defendant and Marlin Lewis), kidnapped and robbed at knife- and gunpoint. Unlike the victim in this case, however, Mr. Miras managed to free himself from the car and escape. George Key also testified about an incident which occurred in 1973. Key was approached by two young men, defendant and an individual named Eddie Davis, who requested his assistance in starting an automobile. When Mr. Key complied, he was distracted by defendant and knocked unconscious by Davis. The pair then stole Mr. Key's white 1957 Chevrolet.

Although the trial court's instruction on aiding and abetting failed to advise the jury that defendant must share the criminal intent of the perpetrator, we find the error harmless beyond a reasonable doubt. The instructions as given required that an aider and abettor have acted with knowledge of the perpetrator's unlawful purpose; hence one aspect of

defendant's mental state was clearly before the jury. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 49 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Croy, supra,* 41 Cal. at pp. 13-14.) Furthermore, George Key's testimony—if believed by the jury—portrayed defendant as an active participant in the assault and robbery, not merely as an aider and abettor. Similarly, if the jury believed that defendant was guilty of the kidnap, assault and robbery of Mr. Miras, there is no likelihood—based on the testimony—that his liability was premised on a theory of aiding and abetting. (See *People* v. *Leach, supra,* 41 Cal.3d at p. 105.) Moreover, the prosecution adduced evidence of nine additional incidents in which defendant used or threatened to use violence. We discern no reasonable possibility that the omission of the shared-intent element could have affected the penalty verdict. (*People* v. *Malone, supra,* 47 Cal.3d at pp. 49-50.)

4. Officer Reid of the California Highway Patrol testified that he was involved in a high-speed chase of the car that defendant and Eddie Davis stole from Mr. Key. During the chase, Officer Reid was wounded by a shotgun blast fired from the rear of the car. Ultimately the car went out of control and Eddie Davis, who was driving, was fatally shot by the officers. Defendant, who was in the backseat, was arrested. Officer Reid testified that he observed only two individuals in the car; he believed defendant fired the shot that wounded him. The prosecutor referred briefly to Officer Reid's testimony during argument.

Defendant contends Officer Reid's testimony was inconsistent with a summary of the incident in defendant's probation report filed after his first trial which states that three individuals were in the car—Eddie Davis, defendant, and defendant's brother. The probation report was not placed in evidence in the retrial, however. Thus, it would have been improper to refer to it during argument. Furthermore, there is no evidence that either Officer Reid or the prosecutor intentionally falsified evidence or that either was even aware of the discrepancy. There is no basis for a finding of prejudicial error.

## B. *Sympathy Instructions*

Defendant contends the jury was inadequately instructed concerning the scope of their consideration of mitigating evidence, particularly the factors of sympathy and background evidence. The contention lacks merit.

At the guilt phase, the trial court gave CALJIC No. 1.00 directing the jury "not to be swayed by mere sentiment, conjecture, sympathy . . . ." The instruction was not repeated at the penalty phase. Rather, the jury was given a modified version of CALJIC No. 8.84.1 that directed the jury to

consider "*all* of the evidence which has been received," and to consider, among other factors, "the defendant's character, history, background and mental condition," as well as "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The trial court in this matter effectively anticipated our decision in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], by expressly instructing the jury to consider evidence of defendant's character and background. Moreover, at defendant's request the trial court specifically declined to give CALJIC No. 8.84.2, thus avoiding the problematic language in the 1979 version decreeing that the jury "shall impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances." In fact, both the prosecutor and defense counsel discussed at length defendant's character and background evidence. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 760 [244 Cal.Rptr. 867, 750 P.2d 741].) Defense counsel had offered evidence of the deprivations of life on an Indian reservation and the pervasiveness of drugs and alcohol in the lives of the people. He also introduced evidence that defendant had been declared a ward of the court at the age of six and placed in a foster home because of parental abuse. Counsel emphasized that from an early age defendant was denied the normal salutary influences of a stable family and community.

While arguing that defendant's mitigating evidence was unpersuasive, the prosecutor made no suggestion that it was legally irrelevant to the penalty determination. ■ Defendant asserts, nevertheless, that the jury may have been misled by the prosecutor's statement: "It is natural for you to feel some extent of pity and sympathy for Douglas Stankewitz. I do. I expect you do to some extent. But that feeling should not interfere with your sense of justice." We do not read these comments as an argument that sympathy should play no role in the jury's determination, but rather that sympathy should not overbalance society's countervailing interest in justice.

Thus, we conclude the instructions and argument adequately advised the jury of the scope of constitutionally relevant mitigating evidence. (*People* v. *Melton, supra,* 44 Cal.3d at p. 760.)

C. *Changes in the Death Penalty Law*

Defendant was properly tried under the 1977 death penalty statute. He contends, however, that he was entitled to an instruction pursuant to an "ameliorative" change in the language of the 1978 death penalty statute, specifically section 190.3, which provides that the jury, after considering the aggravating and mitigating circumstances, "shall impose a sentence of

death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. *If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances, the trier of fact shall impose a sentence of confinement in state prison for a term of life without possibility of parole.*" (Italics added.) Former section 190.3 contained no such language.[15]

Defendant's contention is without merit. ■ In the first place, we have observed that the 1978 initiative was intended to be "purely prospective in effect . . . ." (*People* v. *Easley, supra,* 34 Cal.3d at p. 883.) The presumption that a criminal defendant is entitled to an ameliorative change in the law is just that—a presumption—which plainly does not apply where, as here, the new law provides otherwise. (*In re Estrada* (1965) 63 Cal.2d 740, 744 [48 Cal.Rptr. 172, 408 P.2d 948].)

In addition, we have expressly held that "on balance, the 1978 version [of section 190.3] is much *less* favorable to a defendant than the 1977 provision." (*People* v. *Easley, supra,* 34 Cal.3d at p. 884, italics added.) Moreover, we have held that an instruction which tells the jury that it shall return a death verdict if aggravation outweighs mitigation is ambiguous and susceptible to misinterpretation. (*People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) The same reasoning would apply to an instruction that the jury shall return a life verdict if mitigation outweighs aggravation. ■ As the current instruction directs, the jury's decision—whether for life without possibility of parole or death—must not be based upon a mere arithmetic addition of the weights given the factors on each side of the scale, but rather on an individual assessment of the moral or sympathetic value of the evidence to determine the appropriate penalty. (See CALJIC No. 8.88 (1989 rev.) (5th ed. pocket pt.).) Accordingly, we conclude there is no merit to defendant's contention he was entitled to an instruction pursuant to the 1978 version of section 190.3.

### D. *Instruction on Reasonable Doubt*

Defendant contends the court erred by failing to instruct the jurors sua sponte that in order to impose the penalty of death they must find beyond a reasonable doubt (1) that the aggravating circumstances outweighed the mitigating circumstances and (2) that death was the appropriate penalty. Defendant rests his claim on the due process and cruel and unusual

---

[15]Defendant does not assert, nor does the record indicate, that defendant requested an instruction pursuant to the 1978 version of section 190.3.

punishment clauses of the United States and California Constitutions. We have previously rejected identical claims. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) Defendant has provided us with no persuasive reason to reconsider our prior holdings.

E. *Response to Jury Inquiry*

The trial court did not give the so-called Briggs Instruction that this court invalidated in *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908], reversed *sub nomine California* v. *Ramos* (1983) 463 U.S. 992 [207 Cal.Rptr. 800, 689 P.2d 430], and *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 F.2d 430], certiorari denied 471 U.S. 1119 [86 L.Ed.2d 266, 105 S.Ct. 2367] (*Ramos II*), and the prosecutor did not refer to the Governor's power to pardon or commute a sentence during his argument at the penalty phase.

During penalty deliberations, however, the jury sent the following question to the court: "We, the jury, in the above entitled request the following: One, the jury would like to know if anyone sentenced to confinement in a state prison for life without possibility of parole has been put before a parole board." The court discussed this question with counsel. Defense counsel suggested a response indicating that life without possibility of parole means just that. The prosecutor objected that such a response would not be accurate in light of the trial court's opportunity to review the sentence and the Governor's commutation power. The trial court observed that while he did not wish to mislead the jury, neither did he want to "open[] a can of worms" by discussing the court's power and the Governor's commutation power. Accordingly, the court responded to the jury's inquiry as follows: "The jury was instructed on the applicable law and should not consider or speculate on matters of law on which they were not instructed and in arriving at a verdict of life in prison without possibility of parole or death."

Defendant now contends that the court's response was inadequate. On the contrary, the trial court accurately anticipated our later decision in *Ramos II, supra,* 37 Cal.3d 136, in which we noted that when the jury raises the commutation issue "the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." (*Id.* at p. 159, fn. 12.) Without benefit of the admonition set forth in *Ramos II*, the trial court nevertheless correctly admonished the jury that they were not to consider or speculate on matters not before them in deciding whether to impose death or life without possibility of parole. We have previously held that such curative instructions are adequate to advise the jury as to their proper

sentencing considerations. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 584 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Hamilton* (1988) 45 Cal.3d 351, 372-376 [221 Cal.Rptr. 902, 710 P.2d 981]; *People* v. *Coleman, supra,* 46 Cal.3d at pp. 780-782.) Accordingly, we hold the trial court's admonition was adequate to redirect the jury's attention to its proper sentencing responsibilities.

F. *Victim Impact Evidence*

Relying on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], defendant urges federal constitutional error on the basis of (1) Mr. Key's testimony that he still had a "throat problem" after the assault by Eddie Davis and defendant; (2) Officer Reid's testimony that 14 shotgun pellets remained in his head following the incident involving defendant; (3) the trial court's reference to both (1) and (2) in the course of considering defendant's application for modification of judgment; and (4) the prosecutor's reference in closing argument to the victim's family and friends.

In *Booth* v. *Maryland, supra,* 482 U.S. 496, the United States Supreme Court held that the admission of victim impact statements in capital sentencing proceedings violated the Eighth Amendment by introducing factors "wholly unrelated to the blameworthiness of a particular defendant." (*Id.* at p. 504 [96 L.Ed.2d at p. 449].) The statements placed before the jury in *Booth* included descriptions of the victims' personal characteristics, lengthy and specific details concerning the actual impact on the victims' family, and the family members' opinions about the crime and the defendant. In *South Carolina* v. *Gathers, supra,* 490 U.S. 805 [104 L.Ed.2d 876], the high court reaffirmed *Booth*, holding that the prosecutor's extensive comments to the jury regarding the victim's religious and civic character required reversal. (*Id.* at pp. 810 [104 L.Ed.2d at p. 882].)

We have previously held that *Booth* does not apply to the testimony of a victim of the defendant's prior violent assaults offered as proof of "factor (b)" crimes (§ 190.3, factor (b)). (*People* v. *Karis* (1988) 46 Cal.3d 612, 640-641 [250 Cal.Rptr. 659, 758 P.2d 1189].) However, even assuming arguendo that *Booth* was applicable, we nevertheless find no error. The evidence in question related directly to the circumstances of the crimes in this case (§ 190.3, factor (a)), a subject which remains open to fair comment under *Booth* v. *Maryland*. (482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]; see also *People* v. *Carrera* (1989) 49 Cal.3d 291, 336-337 [261 Cal.Rptr. 348, 777 P.2d 121].) Moreover, we have no doubt that the brief, dispassionate statements by Mr. Key and Officer Reid concerning their injuries and the

trial court's brief reference thereto had no appreciable affect on the penalty verdict.

■ Defendant also objects on the basis of *Booth* v. *Maryland, supra,* 482 U.S. 496, to the prosecutor's statement: "The People want you to reflect for a while on the enormity of the crime committed by Defendant. There was a young girl who normally could be expected to have a long life ahead of her, who was murdered by the Defendant . . . . Theresa Graybeal never again would speak with her friends or family. To imagine the loss that her murder has caused, one thing you can do is imagine the loss you would feel if someone close to you were taken from you or murdered at a young age for no reason at all. Then multiply that, because there were many persons, family and friends, who would miss Theresa Graybeal."

While arguably inappropriate under *Booth*, we are nevertheless persuaded that here, as in *People* v. *Ghent* (1987) 43 Cal.3d 739, 771-772 [239 Cal.Rptr. 82, 739 P.2d 1250], the prosecutor's remarks had no appreciable effect on the penalty verdict. In *Ghent*, as here, the prosecutor observed that the victim's death constituted a profound loss to her family and friends and invited the jurors to " 'think about how you would feel if it were your baby, your daughter, your wife, your sister . . . .' " (*Id.* at p. 772.) As we observed in *Ghent*: "The prosecutor's remarks were brief and mild, commenting upon the obvious loss resulting from [the victim's] death. Unlike *Booth*, where the jury was given lengthy and specific details regarding the *actual impact* on the victim's family, here the prejudicial effect of the prosecutor's comments was undoubtedly minimal or nonexistent." (*Ibid.*, original italics; accord *People* v. *Adcox* (1988) 47 Cal.3d 207, 259-260 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Malone, supra,* 47 Cal.3d at pp. 38-39.) For similar reasons, we conclude the prosecutor's remarks concerning the impact of the victim's death on her friends and family were harmless beyond a reasonable doubt.

G. *Disproportionate Penalty*

Defendant contends he should be given proportionality review on both an intercase and intracase basis. It is well settled that intercase proportionality review is not mandated. (See, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 444-445 [243 Cal.Rptr. 842, 749 P.2d 279].)

As to intracase review, defendant cites *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], in arguing that the death penalty is disproportionate to his personal culpability. *Dillon*, however, is plainly distinguishable. There, an immature 17-year-old defendant who shot and killed his victim out of fear and panic was sentenced to life imprisonment

despite the views of the court and jury that the sentence was excessive in relation to his actual culpability. (*Id.* at p. 487.) Nothing in the record points to similar factors in defendant's case.

### H. *Ineffective Assistance of Counsel*

Finally, defendant contends he was denied effective assistance of counsel at both the guilt and penalty phases of trial. We find the contention to be without merit.

■■■ "A defendant claiming ineffective assistance of counsel has the burden of showing that 'counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates.' (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.) In addition, the defendant must show that counsel's acts or omissions deprived him of a potentially meritorious defense (*ibid.*) or that it is 'reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings' (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584). Once the defendant has met these burdens, the appellate court must examine the record to determine whether there is any explanation for counsel's acts or omissions." (*People* v. *Miranda, supra,* 44 Cal.3d at p. 119.)

Defendant asserts that trial counsel rendered ineffective assistance at the guilt phase of trial in five respects. First, he cites counsel's failure to impeach Billy B.'s testimony with his testimony at the preliminary hearing. He contends such impeachment would have adduced evidence sufficient to compel an instruction that Billy was an accomplice as a matter of law. We disagree. Billy's testimony at both trials was generally consistent; it showed that he was informed of the plan to steal the car and abduct the victim, and was aware that the others were armed. As discussed in part II.B. (*ante*, pp. 90-93), however, this was not sufficient to make Billy an accomplice as a matter of law. While impeachment might have exposed some inconsistencies in Billy's testimony, the net result would still have been an instruction leaving it to the jury to sift through the conflicting evidence and determine for itself whether Billy was an accomplice. Counsel diligently requested the court to instruct the jurors that Billy was an accomplice as a matter of law pursuant to CALJIC No. 3.16. No attempted impeachment of Billy with his largely consistent testimony at the first trial and the preliminary hearing could have altered the court's decision to deny the request.

Next defendant asserts that counsel was remiss in failing to request an instruction that evidence of oral admissions should be viewed with distrust (CALJIC Nos. 2.71, 2.71.7). As we concluded in part II.C. (*ante*, pp. 93-94), however, a result more favorable to defendant was not a reasonable probability absent this omission. ■■■ In the absence of prejudice, coun-

sel's failure to request the instruction cannot be characterized as constitutionally deficient representation. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052]; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.)

Defendant next scores defense counsel for failing to object to the admission of the writings seized from his prison cell. Other than noting that the papers were introduced over objection at his first trial, however, defendant offers no potential basis for objection that counsel might have overlooked. Thus, there is no basis to conclude that counsel erred in failing to object to the evidence, much less that he rendered ineffective assistance.

Defendant also complains of counsel's failure to establish that the automobile in which the group traveled from Sacramento to Manteca (where it was impounded by the police) was not stolen. He asserts that the point was relevant to the question of whether defendant intended to permanently deprive the murder victim of her car. Defendant notes that the jury at his first trial was informed by stipulation the impounded vehicle had not been stolen.

We are not persuaded that counsel's failure to establish the impounded car had not been stolen rises to the level of constitutionally inadequate assistance of counsel. First, the jury was not actually informed that the vehicle had been stolen, only that the police officers suspected it had been stolen. Furthermore, the evidence overwhelmingly indicated that defendant intended to permanently deprive the murder victim of her vehicle. When defendant was arrested, several hours after the execution-style slaying of the victim, he was still in possession of the car. Hence, it is not probable a result more favorable to defendant would have resulted absent the omission, and counsel cannot therefore be said to have rendered constitutionally inadequate representation. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-696 [80 L.Ed.2d at pp. 693-699].) Accordingly, we also reject defendant's claim that counsel was ineffective in failing to request an instruction on the lesser included offense of taking a vehicle with the intent to permanently deprive the owner of possession. (Veh. Code, § 10851.)

Defendant also contends counsel rendered ineffective assistance by failing to object to defendant's shackles until the 14th day of the jury voir dire. As discussed in part II.D. (*ante,* pp. 94-97), however, defendant was subsequently accorded two full hearings on the necessity of the shackles. The trial court properly determined there was a manifest need for restraints, and imposed the least obtrusive restraints available under the circumstances. We can discern no prejudice to defendant from the fact that the hearing was held after the imposition of the shackles rather than before. Therefore, counsel's failure promptly to request a hearing does not afford a basis for reversal on the grounds of ineffective counsel.

Finally, defendant contends that counsel rendered constitutionally inadequate assistance at the penalty phase of trial by his failure to call "the medical witnesses who had testified at the first trial." Though defendant does not specifically identify the "medical witnesses" whom he contends counsel should have called, presumably he means Drs. Leifer and Melges, who testified in support of defendant's diminished capacity defense at the guilt phase of his first trial, and Dr. Missett, who testified at both the guilt and penalty phases of the first trial.

The record indicates that defendant was adamantly opposed to presenting a diminished capacity defense at the guilt phase. A review of Dr. Missett's testimony at the first penalty trial discloses a rather clear tactical reason that counsel might not have wished to raise the matter at the penalty phase. Dr. Missett's psychological evaluation of defendant was that he is a "sociopath," a personality type he described as "callous," "selfish," and unconcerned with "either morality or the rights of others." Also, Dr. Missett found no indication that defendant was psychotic, and while he speculated that defendant's behavior stemmed, in part, from a violent family background, he was unwilling to testify that defendant had no "choice" but to act violently. The testimony of Drs. Leifer and Melges at the guilt phase was similarly couched. Dr. Melges stated that he had diagnosed defendant as a sociopathic type. Dr. Leifer testified that defendant's performance on various intelligence tests varied widely, from extremely retarded to average; Dr. Leifer conceded, however, that defendant had the capacity to understand the moral and societal sanctions against killing. Furthermore, Dr. Zeifert, a psychiatrist who testified for the prosecution on rebuttal, stated that defendant's test results did not indicate a mental defect or an inability to premeditate and deliberate.

A diligent attorney reviewing the foregoing medical testimony from defendant's first trial might reasonably have concluded that on the whole the evidence was far more damaging than helpful. As we recently observed with respect to a claim of ineffective assistance based on very similar facts, the record here amply justifies a "tactical decision not to open the 'Pandora's Box' of defendant's [psychological] background." (*People* v. *Miranda, supra,* 44 Cal.3d at p. 122.) This decision was well within the range of reasonably competent assistance. (*Id.* at p. 123; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.)

Defendant nevertheless insists that the medical testimony was necessary to show that defendant came from an unstable and violent family background. In this regard, defendant also asserts that counsel was remiss in failing to call Ethel Bollmeyer, who testified at defendant's first penalty

trial that she happily served as defendant's foster mother for several years. Defendant overlooks the fact that the People called a rebuttal witness who sharply contradicted Mrs. Bollmeyer's testimony. Mr. Fuchs, a supervising probation officer for the County of Fresno, testified that Mrs. Bollmeyer had asked him to remove defendant from her home. Thus, the record displays an eminently satisfactory tactical reason for not having called Mrs. Bollmeyer to testify at defendant's second penalty trial. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 707 [248 Cal.Rptr. 69, 755 P.2d 253].)

Defendant further overlooks the fact that counsel called four witnesses at penalty phase, two of whom testified directly about defendant's background and social development. Joe Walden, director of juvenile probation for the Fresno County Probation Department, testified that he first met defendant when he was assigned to investigate defendant's family for a dependency hearing. Defendant was six years old and had received a severe beating, possibly with a telephone cord, from his mother. Walden explained that defendant's father had a lengthy arrest record and had served time in both county jail and state prison. His mother had been arrested on several occasions and had spent time in county jail. As a result of the investigation, defendant was declared a dependent child. He was initially admitted to Napa State Hospital for a lengthy evaluation and later placed in a foster home for four years.

Counsel also called Theresa Montgomery, who was personally acquainted with defendant's family and the reservation where defendant spent some of his youth. Ms. Montgomery described from first hand experience the pervasive influence of drugs and alcohol and the lack of educational opportunities on the reservation. Counsel also presented a portion of the prior testimony of Jean Shacklett, a parole investigator, who had interviewed defendant the day after the homicide. Ms. Shacklett observed at the time that defendant's arm had several open sores that appeared infected and a needle mark, suggesting recent drug use. Counsel emphasized all of this evidence during penalty phase argument, eloquently portraying a youth deprived of a decent and stable home environment, subjected to physical abuse, and placed in foster homes.

On this record, we cannot conclude that counsel failed adequately to present evidence of defendant's background and character or to render constitutionally effective assistance of counsel. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 122-123; *People* v. *Babbitt, supra,* 45 Cal.3d at p. 707.)

## IV. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., and Kennard, J., concurred.

MOSK, J.—I concur in the judgment. After review, I have found no error requiring reversal.

I write separately because I cannot join in the majority's labored and potentially mischievous analysis concerning defendant's interrelated claims that (1) the court was without authority to hold proceedings on his pro se motion for substitution of counsel after it ordered a hearing into his mental competence; (2) the court failed to conduct a meaningful mental-competence hearing; and (3) the statutory presumption of mental competence (Pen. Code, § 1369, subd. (f)) is violative of due process when a defendant has offered some constitutionally significant evidence to the contrary.

First, the court did indeed have authority to hold proceedings on defendant's pro se substitution-of-counsel motion even after ordering a mental-competence hearing. It is true that Penal Code section 1368, subdivision (c), provides in relevant part that "when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." The evident intent of the Legislature in enacting the statutory provisions on the determination of mental competence (Pen. Code, § 1367 et seq.) was to establish a form of inquiry that was fair in procedure and reliable in result. In light of that intent, the phrase "all proceedings" should be construed to mean "all proceedings *except such as may be reasonably necessary to facilitate the determination of mental competence.*" The court impliedly found that the proceedings on defendant's substitution-of-counsel motion were in fact reasonably necessary to facilitate that determination. Under any standard, that finding was sound.

Second, the court did indeed conduct a meaningful mental-competence hearing. It is reasonably clear from a close reading of the record that the court's determination of defendant's mental competence was based on what it saw and heard, in open court and especially in camera, in the course of the ancillary proceedings on defendant's substitution-ofcounsel motion. It impliedly found that defendant did not harbor any delusions at all affecting his mental competence, but merely entertained "a deep distrust for the public defender" (*People* v. *Huffman* (1977) 71 Cal.App.3d 63, 70, fn. 2 [139 Cal.Rptr. 264])—an attitude that may be baseless but is evidently not uncommon. "It is an odd phenomenon familiar to all trial judges who handle arraignment calendars that some criminal defendants have a deep

distrust for the public defender . . . . It is almost a truism that a criminal defendant would rather have the most inept private counsel than the most skilled and capable public defender." (*Ibid.*) Under any standard, the court's determination of defendant's mental competence was sound.

Third, we need not decide whether the statutory presumption of mental competence (Pen. Code, § 1369, subd. (f)) is violative of due process when a defendant has offered some constitutionally significant evidence to the contrary. In this case, defendant did not offer any evidence of mental incompetence whatever. Here, the relevant proceedings were initiated when "a doubt [arose] in the mind of the judge as to the mental competence of the defendant . . . ." (Pen. Code, § 1368, subd. (a).) That doubt arose not from evidence introduced by defendant, but merely from representations made by his counsel.

In passing, I note two additional problems. The majority hold that the court did not err by instructing the jury to determine whether Billy B. was an accomplice. But their analysis supports the opposite conclusion. They state that "the evidence indicated that Billy B. was not an accomplice as to any of the offenses charged against defendant." (Maj. opn., *ante*, at p. 92.) From that assertion it would follow that the court erred by leaving the issue of accomplice liability for the jury: evidentiary support was lacking.

In addressing an ineffective-assistance claim, the majority declare: " 'A defendant claiming ineffective assistance of counsel has the burden of showing that "counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." [Citation.] In addition, the defendant must show that counsel's acts or omissions deprived him of a potentially meritorious defense [citation] or that it is "reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings" [citation]. *Once the defendant has met these burdens, the appellate court must examine the record to determine whether there is any explanation for counsel's acts or omissions.*' " (Maj. opn., *ante*, at p. 113, italics added.) But once the defendant has met the burdens of showing deficient performance and prejudice, *he prevails.* The italicized language in the majority opinion implies that deficient performance can somehow be justified or excused—or in any event rendered constitutionally insignificant—if it can be "explained." Such a position, however, is untenable. Counsel's performance is evaluated under an *objective* standard: his explanation for acting, or failing to act, as he did is simply immaterial if his conduct is in fact objectively unreasonable under prevailing professional norms. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052] [decided under federal Constitution];

*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839] [decided under federal and state Constitutions].)

Nevertheless, having found no error requiring reversal, I concur in the judgment.

Appellant's petition for a rehearing was denied August 29, 1990.