Filed 5/11/15  P. v. White CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249633 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA051890) |
| v. | |
| DEWANN WESLEY WHITE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles (Carlos) A. Chung, Judge.  Reversed.

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James W. Bilderback II and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant and appellant Dewann Wesley White of first-degree murder for the killing of Maurillio Ponce. In trying White for first-degree murder, the prosecution relied on a direct aiding and abetting theory, arguing that cell phone records established that White was involved with Ponce's murder. White contends insufficient evidence supports his conviction. We agree. The prosecution did not produce sufficient evidence to establish that White intended to kill Ponce or aid and abet his murder. Accordingly, we reverse the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

*1.      Maurillio Ponce's Murder*

Maurillio Ponce lived in Lancaster with his wife, Evangelina Flores, and their three children. He owned a diesel-truck repair shop and tire yard located in Littlerock, about 30 miles southeast of Lancaster. He owned two pickup trucks, both of which he used for work, and he was leasing a white Lincoln Navigator, which his wife primarily drove.

On the evening of October 6, 2008, Ponce asked Flores if he could drive the Navigator to meet a person named Tony in Valencia or Santa Clarita. Later that night, around 10:00 p.m., Flores heard Ponce receive a phone call from someone he called "Tony." Around 11:00 p.m., Ponce changed into casual clothes and left his house in the Navigator. He told Flores to wait for him because he did not expect to be gone long. Although Ponce regularly responded to business calls during the evening, Flores thought his behavior that night was strange because he usually drove one of his trucks and wore work clothes to respond to such calls.

---

[1]      Because White challenges only the trial court's denial of his motion for acquittal under Penal Code section 1118.1 (all further statutory references are to the Penal Code unless otherwise specified), which was made at the close of the prosecution's case-in-chief, we draw the following factual summary from the evidence presented during the prosecution's case-in-chief. (See *People v. Hajek* (2014) 58 Cal.4th 1144, 1183 (*Hajek*) ["[R]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point."].)

Between 12:30 a.m. and 1:30 a.m. on October 7, 2008, Flores called Ponce's cell phone several times, but Ponce never answered. At 2:00 a.m., Flores called Ponce's phone again, this time receiving a busy signal.

Around 1:30 a.m. that same morning, two security guards working at a utility substation located near Avenue J and 90th Street West in Lancaster heard six gunshots fired near Avenue I, from a location northwest of the substation. The security guards heard no voices or other sounds, such as the revving of a car's engine or the squealing of a car's tires, come from the direction from which the shots were fired.

Around 2:00 a.m. that same morning, a man driving home from work spotted a body lying prone on the shoulder of Avenue I, near the road's intersection with 110th Street West. After the man called 9-1-1, the Los Angeles County Sheriff's deputies responded to the scene and identified the body as Ponce's. Ponce had been shot several times: twice in the head; once in the left arm; once in the chest; and twice in the back. Five nine-millimeter bullet casings and one expended nine-millimeter bullet were found near Ponce's body. The casings were later determined to have been fired by the same weapon, likely a Smith and Wesson semi-automatic handgun. The expended bullet was also likely fired from a semi-automatic handgun, such as a Smith and Wesson.[2] Aside from Ponce's body, the bullet casings, and the expended bullet, no other physical evidence related to the crime was recovered at the scene.

The autopsy report later concluded that Ponce died from multiple gunshot wounds. The report also revealed that he had suffered blunt force trauma, likely from a shoe, to his head, back, arms, and legs.

2. *The Investigation and Subsequent Arrests*

In the early morning hours of October 7, 2008, the Sheriff's Department began investigating Ponce's murder. A deputy canvassed the rural area, contacting the residents of two houses on Avenue I near the crime scene. None of the residents reported hearing gunshots or any other suspicious or unusual noises earlier that morning. The same

---

[2] The gun used to kill Ponce was never found.

deputy contacted Flores at her house on 70th Street, which was about six miles from the crime scene. Flores provided the deputy with Ponce's cell phone number and the Navigator's license plate number. The deputy was unable to track Ponce's cell phone through its provider, Sprint Nextel.

Soon after Ponce's death, the Sheriff's Department obtained the call records for Ponce's cell phone. The records showed that around 11:00 p.m. on the night of his death, Ponce had received a call from a phone with the number (424) 219-2502. The number was assigned to a prepaid phone and registered to a fake name and address.[3] However, the Sheriff's Department later determined that the phone was owned by Anthony Smith, who lived in Marina del Rey.

In early November 2008, the Sheriff's Department began conducting surveillance on Smith's apartment in Marina del Rey. On November 5, 2008, Ponce's Navigator, which had been missing since the night of his death, received a parking ticket on 6th Avenue near Slauson Avenue in Los Angeles.

On November 6, 2008, Detectives Robert Gray and Martin Rodriguez, who were leading the Sheriff's Department's investigation, found Ponce's Navigator parked in a stall registered to Smith at his Marina del Rey apartment complex. The front license plate on the Navigator matched the plate registered to Ponce, but the rear license plate was registered to a different vehicle that had earlier been reported stolen. Detectives Gray and Rodriguez reviewed security video footage from the apartment complex, which showed that the Navigator and a green pickup truck with collision damage had entered the complex's parking structure on November 5. The detectives observed that a large African-American man resembling Smith drove the Navigator and a large African-American man later identified as Charles Honest drove the truck.

---

[3]     A representative of Boost Mobile, the company from which the prepaid phone was purchased, testified that the company does not require its customers to provide real names and addresses when purchasing and activating prepaid cell phones.

Smith was arrested at the Marina del Rey complex, and the Sheriff's Department executed a search warrant at his apartment. Several firearms were found in Smith's apartment, including a .38-caliber handgun and an assault rifle. Nine-millimeter ammunition and an empty ammunition magazine for a handgun were also found, but no nine-millimeter handguns were located. Sheriff's personnel also found fake law-enforcement and bail-recovery apparel, some of which bore Smith's name, as well as badges resembling those used by various law-enforcement and bail-recovery agencies.[4] Sheriff's investigators recovered two cell phones belonging to Smith, one with the number (424) 219-2502, and another with the number (310) 350-9557. The cell phone associated with the (310) number contained the contact information for Ponce, White, and Honest. Investigators also recovered Ponce's cell phone inside Smith's apartment.

In the apartment complex's parking structure, investigators found Ponce's Navigator and the green pickup truck with collision damage parked in the stalls registered to Smith, who was in possession of the Navigator's keys. None of White's belongings or fingerprints were found in the apartment or the Navigator. Detectives Gray and Rodriguez interviewed Smith on November 6 and 7, 2008.

On October 21, 2009, the Sheriff's Department executed a search warrant on Honest's apartment in downtown Los Angeles. During the search, Detective Gray recovered a cell phone with the number (424) 219-3527.

The Sheriff's Department began investigating White, who lived with his wife in Bloomington, San Bernardino County, around August 2009, after they discovered that a cell phone registered to his motor-sports business (phone number (909) 419-9094) had exchanged several calls with Smith's and Honest's phones shortly before and after Ponce's death. On May 5, 2010, the Sheriff's Department executed a search warrant at White's house in Bloomington. Detective Gray found the phone that was registered to

---

[4]     A search of Smith's background revealed no association with any law-enforcement or bail-recovery agencies.

White's business in White's bedroom. The phone contained a contact listing the phone number (310) 483-1688, which was registered to Honest.[5] Detective Gray also found a gun-target silhouette riddled with bullet holes attached to the door leading from White's house into his garage.

*a.     White's First Interview*

Also on May 5, 2010, Detectives Gray and Rodriguez interviewed White.[6] During his interview, White said that he was the only person who used the phone registered to his business. He told the detectives that he had worked as a longshoreman since 2004, that he used to provide armed security for a company, and that he sometimes made truck deliveries on the side because he held a Class A driver's license. He also told the detectives that his cousin worked at an auto-repair shop located near 6th Avenue and Slauson Avenue.

He said that he knew Honest because they had worked together as longshoremen for several years. Initially, he denied doing side jobs with Honest, claiming that he only saw Honest outside of work when they were trying to meet girls together. He also initially denied being familiar with the Lancaster area. He told the detectives that he may have gone to the area three or four times to meet girls or make truck deliveries, but he denied being in Lancaster around 1:00 a.m. on October 7, 2008. He then stated that the only reason he would have been in Lancaster on the night of October 6 and the morning of October 7, 2008 would have been to meet girls. He also denied ever being in Lancaster with Honest.

After the detectives told White that they had recently arrested Honest on suspicion of murder, White stated that he may have heard from Honest about a job in Lancaster,

---

[5]     The same contact listed another 10-digit number, which was assigned as the direct-connect contact for the (310) number registered to Honest. Direct connect is a two-way-radio-like feature enabled on certain Sprint Nextel phones, which allows a user to directly communicate with another direct-connect enabled phone by the push of a button, without the need to place a regular phone call.

[6]     The interview was played for the jury.

scheduled for October 6, 2008, with someone who was willing to pay a driver $5,000 to move some cargo. When asked about the job, White denied that he knew Smith. After the detectives presented cell phone records showing that White's phone had received calls from Smith's phone on October 5, 2008, White claimed that he believed the calls were coming from Honest to discuss the potential job. He later admitted that he knew Smith, but stated that he was not as close to him as he was to Honest.

White told the detectives that he left his house in Bloomington around 9:00 p.m. or 10:00 p.m. on October 6, 2008. However, his phone records showed that he left Bloomington around 6:00 p.m., and that he was in South Los Angeles and Marina del Rey between 9:00 p.m. and 10:00 p.m. that evening.

White told the detectives that he discovered that the job had fallen through after he arrived in Lancaster during the late evening of October 6 or early morning of October 7, 2008. He said that he had planned to meet with Honest in Lancaster to retrieve the keys to the truck he was supposed to drive, but that when he arrived in Lancaster, Honest told him that the job had fallen through. He told the detectives that he met Honest on the side of the 14 Freeway near Pearblossom Highway.[7] Honest appeared upset but did not tell White why the job had not gone through, and White did not ask for an explanation. Honest was driving a black Dodge Magnum with a passenger in the front seat, but White could not identify who the passenger was. After meeting with Honest, White called his wife around 2:30 a.m. on October 7 to tell her that he was coming home.

*b.      White's Arrest and  Second Interview*

On March 2, 2011, White was arrested at his house in Bloomington in San Bernardino County. Investigators found a 12-gauge shotgun and a bullet-proof vest during a search of the house. The next day, Detective Rodriguez interviewed White a second time. Rodriguez's tape recorder malfunctioned during the interview, so he read to the jury a summary of his notes from the interview.

---

[7]     He also stated that he waited for Honest at a Shell gas station near the 14 Freeway.

7

White went to Lancaster during the late evening of October 6, 2008 because Honest had asked him to drive a load of stolen goods. When he arrived in Lancaster, Honest called and told him the job was off. He then met with Honest in person at a location west of the 14 Freeway near the Crown Valley Road off ramp in Acton. Honest was driving a pickup truck with a male passenger. Honest appeared very upset and told White that "Things went bad. It's down." White then called his wife and started driving back to Bloomington.

On March 3, 2011, Smith was arrested at his home in Fontana in San Bernardino County. In August 2011, the LAPD executed a search warrant at Smith's Fontana house, where they found a .38-caliber revolver with ammunition, an ammunition magazine for a .40-caliber handgun, a laser-sight attachment for a firearm, and a book entitled, "Professional Killers, an Inside Look."

On June 16, 2011, White, Smith, and Honest were charged with Ponce's murder.

*3.    Cell Phone Evidence*

In linking White to Ponce's murder, the prosecution and the Sheriff's Department relied primarily on cell phone records mapping the approximate locations of White's, Honest's, Smith's, and Ponce's cell phones during the period between October 5 and October 7, 2008. At trial, the prosecution established that the following cell phone numbers were registered to the following individuals: (1) (661) 816-8212 was registered to Ponce; (2) (424) 219-2502 and (310) 350-9557 were registered to Smith; (3) (424) 219-3527 and (310) 483-1688 were registered to Honest; and (4) (909) 419-9094 was registered to White. White's, Smith's, Honest's, and Ponce's phone numbers were all subscribed with Sprint, Nextel, or Boost Mobile, a subsidiary of Sprint.[8] The prosecution also established White's, Smith's, and Honest's residential addresses at the time of Ponce's murder: White lived in Bloomington; Smith lived in Marina Del Rey, with a second house in Fontana in San Bernardino County; and Honest lived in South Los Angeles.

---

[8]    Although Sprint and Nextel are owned by the same company, the two networks maintain separate records with different record-keeping methods.

The prosecution introduced the testimony of a Sprint Nextel employee, who explained the process of tracking cell phone calls made on the companies' networks through cell towers. When making or receiving a call on a Sprint or Nextel network, the user's phone will connect to the cell tower that is emitting the strongest signal. The strength of a cell tower's signal with respect to a user's phone is influenced by a number of factors, including: the proximity of the phone to the tower; the clarity of the line of sight between the phone and the tower; the intensity of other radio-frequency traffic near the phone and the tower; and the inherent strength of the tower. The maximum range within which a cell phone is capable of connecting with a cell tower varies between two miles in an urban setting and 10 miles in a rural setting. A cell phone may connect with more than one cell tower throughout the duration of a single call, depending on the movement of the phone and the strength of the cell towers within the phone's range. Accordingly, if a phone is being used inside a moving car, it is likely to connect with more than one cell tower throughout a single call, especially if the car is on a freeway or highway.

The prosecution introduced the testimony of a cell phone expert from the Los Angeles Police Department, who, relying on Sprint Nextel records associated with White's, Smith's, Honest's, and Ponce's cell phones, opined as to the locations of those phones at times leading up to and following Ponce's death. Relying on the cell phone expert's testimony and the Sprint Nextel records, Detective Gray opined about the movements of White's, Smith's, Honest's, and Ponce's cell phones on October 6 and 7, 2008.

On October 5, 2008, Smith's (424) cell phone called White's cell phone twice: once at 3:45 p.m., and again at 4:24 p.m. The first call lasted approximately 3 minutes and 20 seconds, and the second call lasted approximately 1 minute.

On October 6, 2008, at 8:40 p.m., Honest's (310) cell phone called White's cell phone, with White's phone connecting to a cell tower located at 6941 South Vermont Avenue near Carson. At 9:14 p.m., White's (909) cell phone made a call to an unidentified person's phone, with White's phone connecting with a cell tower located

9

near Inglewood. At 9:48 p.m. another call was made from White's cell phone, communicating with a cell tower located near Marina del Rey and Westchester. Detective Gray opined that, based on the locations of these calls, White's phone was near Honest's house in South Los Angeles around 9:00 p.m. or 9:15 p.m., and then it was moved toward Smith's apartment in Marina del Rey around 9:45 p.m.

At 10:04 p.m., Smith's (424) cell phone received a call from Ponce's cell phone. Smith's phone connected with a cell tower located near his residence in Marina del Rey. At 10:20 p.m., Smith's (424) phone received another call from Ponce's phone and communicated with another tower located in Marina del Rey. At 10:56 p.m., Smith's cell phone received another call from Ponce's cell phone. This time, Smith's phone connected with a tower located near the 118/405 freeway interchange in Granada Hills. Based on the locations of these calls, Detective Gray opined that Smith's phone moved from the Marina del Rey area north along the 405 Freeway.

At 11:07 p.m., Smith's phone called Ponce's phone, with Smith's phone connecting with a cell tower located near Soledad Canyon Road in Santa Clarita, between the 14 Freeway and Sand Canyon Road. At 11:10 p.m., Honest's phone made a call that communicated with the same cell tower. Based on the locations of these calls with respect to the call Smith's phone received at 10:56 p.m., Detective Gray opined that Smith's and Honest's phones had travelled north along the 405 Freeway to the 14 Freeway in Santa Clarita, via the 5 Freeway. Detective Gray also opined that at the time of the 11:07 p.m. call, Ponce's phone was at Ponce's house.

At 11:43 p.m., Smith's phone made another call to Ponce's phone, with Smith's phone connecting with the Soledad Canyon Road tower in Santa Clarita and Ponce's phone connecting with a tower located near the 14 Freeway and Red Rover Mine Road in Acton.[9] Detective Gray opined that Ponce's phone had travelled south on the 14 Freeway, from Ponce's house to Acton. Detective Gray also opined that Smith's phone had remained in the same location as when it called Ponce's phone at 11:07 p.m.

---

[9] The call placed 11:43 p.m. was the last call placed or received on either of Smith's phones until 3:18 a.m. on October 7, 2008.

10

On October 7, 2008, at 12:53 a.m., Ponce's cell phone made a call that connected with a cell tower located near the 14 Freeway and Avenue S in Palmdale. According to Detective Gray, Ponce's phone had travelled back north toward Lancaster on the 14 Freeway.

At 1:03 a.m., White's cell phone called Honest's (310) cell phone. Both phones connected with the same cell tower located near Avenue I and the 14 Freeway in Lancaster. According to Detective Gray, the cell tower with which both phones connected is located a little more than eight miles from where Ponce was murdered approximately 25 minutes later.

At 1:05 a.m., White's phone called Honest's (424) phone. White's phone connected with the same cell tower located near Avenue I and the 14 Freeway. Honest's (310) phone first connected with a cell tower located near the Sierra Highway and Avenue I in Lancaster. At the call's termination, Honest's phone connected with a cell tower located at 5041 West Avenue M in the Quartz Hill area of Lancaster, southwest of the call's originating cell tower located near the Sierra Highway and Avenue I. Detective Gray testified that the cell tower that Honest's phone connected to at the end of the 1:05 a.m. phone call is located a little more than seven miles from where Ponce was murdered.

At 2:02 a.m., Ponce's phone received a call and connected with a cell tower located near the 14 Freeway and Red Rover Mine Road in Acton. At 2:04 a.m., Honest's (310) phone called Honest's (424) phone. Both phones connected to the same tower that Ponce's phone connected to two minutes earlier. Based on the locations of these calls, Detective Gray opined that someone drove Ponce's Navigator, which likely contained Ponce's phone, from the crime scene. Because both of Honest's phones were communicating with each other and connecting to the same cell tower that Ponce's phone was communicating with only two minutes earlier, Detective Gray believed that Smith and Honest were communicating with each other through Honest's phones, while one drove Ponce's Navigator and the other drove a different car.

At 2:16 a.m., Honest's (424) phone called his (310) phone. Both phones connected to the same cell tower, which was located near the 14 Freeway and Sand

11

Canyon Road in Santa Clarita. Based on the location of this call, Detective Gray opined that the people using Honest's phones had travelled south along the 14 Freeway.

At 2:27 a.m., White's phone made a call and connected with a tower located in Canyon Country, near the 14 Freeway and Soledad Canyon Road. That tower is located several miles north of the tower that Honest's phones connected with at 2:16 a.m. Detective Gray opined that White's phone was travelling in the same direction as Smith and Honest, but several miles behind them.

At 2:30 a.m., White's phone called Honest's (310) phone. White's phone connected with a tower located near Dockweiler Drive in Santa Clarita, several miles south of the tower that the phone had connected with during the call placed at 2:27 a.m. Honest's phone connected with the tower located near the 14 Freeway and Sand Canyon Road in Santa Clarita, which is the same tower the phone had connected with at 2:16 a.m. Detective Gray opined that White's phone had continued south and travelled past Honest's phone along the 14 Freeway.

At 2:38 a.m., Honest's (424) phone called his (310) phone. The (424) phone connected with a tower located near the 405 and 101 freeways in Sherman Oaks. Honest's (310) phone connected with a tower located near the 5 Freeway's interchange with the 210 Freeway in Sylmar. According to Detective Gray, Honest's phones were retracing (in the opposite direction) the route travelled by Honest's and Smith's phones around 11:00 p.m. on October 6, 2008.

At 2:46 a.m., Honest's phones again communicated with each other, with the (424) phone connecting with a tower located on Ventura boulevard near Encino and the (310) phone connecting with a tower near the Vanowen exit on the 405 Freeway. At 2:49 a.m., another call was placed between Honest's phones, with the (424) phone connecting with a tower located near the 405 Freeway and the Oxnard Street/Sepulveda Boulevard exit in Van Nuys, and the (310) phone connecting with a tower located between Oxnard Street and the 405 Freeway in Van Nuys. Detective Gray opined that the two phones continued to travel south toward Los Angeles on the 405 Freeway. Detective Gray

12

testified that, during the calls placed between 2:38 a.m. and 2:49 a.m., Honest's phones and White's phone were in the vicinity of two bodies of water near the Sepulveda Basin.

At 3:02 a.m., White's phone called Honest's (310) phone. White's phone connected with a tower located in Inglewood and Honest's phone connected with a tower located near the 405 Freeway, between the 101 and 10 freeways. One minute later, White's phone called Honest's (310) phone again, with White's phone connecting to a tower located in Lennox and Honest's phone connecting with a tower located near the 405 Freeway and Sepulveda Boulevard in Los Angeles, several miles south of the tower that Honest's phone connected with at 3:02 a.m. Detective Gray opined that White's phone had travelled into Los Angeles, near Inglewood, while Honest's phone was farther north and approaching Los Angeles along the 405 Freeway.

At 3:19 a.m., Honest's (424) phone called Smith's (424) phone. Both phones connected with a tower located near Overland Avenue in Culver City. Based on the location of the phones during this call, Detective Gray opined that the phones had travelled to the house of Honest's ex-girlfriend, who lived in the Palms area of Los Angeles.

At 3:37 a.m., White's phone called Honest's (310) phone. White's phone connected with a cell tower located on South Vermont Avenue near Inglewood, and Honest's phone connected with a tower located on West Washington Boulevard near Culver City. Detective Gray opined that White's phone was in the area of Honest's house in South Los Angeles.

At 5:19 a.m., White's phone called Honest's (310) phone again, with White's phone connecting to a tower located near his home in Bloomington, and Honest's phone connecting with a tower located on Cahuenga Boulevard East, near the 101 Freeway and the Hollywood Reservoir in Los Angeles. Detective Gray opined that White's phone had travelled back to White's house in Bloomington, while Honest's phone travelled east toward the Hollywood Reservoir.

Thus, according to Detective Gray, about 25 minutes before Ponce was killed, White's cell phone made two calls to Honest from an area eight miles from where Ponce

13

was found.  The next calls from White's cell phone – one to Honest's phone – were approximately one hour after the fatal shooting, from Canyon Country and Santa Clarita, some 25 miles from the murder scene.

4.      *Other Evidence*

One of Ponce's former employees testified that several months before Ponce's death, he saw a green pickup truck with collision damage, which he identified as the same truck found at Smith's Marina del Rey apartment, arrive at Ponce's tire yard in Littlerock.  He saw a large African-American man driving the truck.

On a later date, while waiting with Ponce at a fast-food restaurant in Lancaster, the employee saw the same truck being driven by the same man, with another large African-American man in the passenger seat, pull into the restaurant's parking lot.  While at the restaurant, he heard someone call the driver of the truck, "Anthony."  The employee testified that Ponce got inside the truck with the two men.  Ponce and the two men left the parking lot in the truck, and they did not return until several hours later.

During his cross-examination, Detective Rodriguez testified that White's DNA and fingerprints were not found in Ponce's Navigator.  He also testified that no physical evidence linking White to Ponce's murder was ever recovered, and that his suspicion that White was involved with Ponce's murder was based primarily on White's cell phone records.

5.      *Court Proceedings*

On June 16, 2011, an information was filed, charging White, Smith, and Honest with Ponce's murder (§ 187, subd. (a)).  Smith and Honest were tried together, and White received a separate trial.[10]  At the close of the prosecution's case-in-chief, White filed a motion for acquittal under section 1118.1, which was heard and denied by the trial court.

---

[10]      In Honest and Smith's trial, the jury did not reach a verdict as to Smith but convicted Honest of second-degree murder on a direct aiding and abetting theory.  In a separate, unpublished opinion, we reversed Honest's conviction for insufficient evidence. (See *People v. Honest* (Sept. 30, 2014, B242979) [nonpub. opn.].)

Following the prosecution's case-in-chief, White testified and introduced the testimony of two other witnesses.

The jury convicted White of first-degree murder. After the jury issued its verdict, White filed a motion for a new trial, which was heard and denied by the court. The court then sentenced White to a prison term of 25 years to life.

## DISCUSSION

White contends the trial court erred in denying his section 1118.1 motion for acquittal.[11] Essentially, he argues insufficient evidence supports his conviction for first-degree murder on a direct aiding and abetting theory of liability. (See *Hajek*, *supra*, 58 Cal.4th at pp. 1182-1183 [review of sufficiency of the evidence to support a conviction or deny a section 1118.1 motion for acquittal is the same].) Specifically, White argues the prosecution failed to produce sufficient evidence to establish that he either intended to kill Ponce or knowingly and intentionally aided the perpetrator's killing of Ponce. We agree and reverse his conviction.

## I.      Relevant Legal Principles

### A.  Standard of Review

"In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. [Citation.] '"[W]e do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact

---

[11]      Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

15

the trier could reasonably deduce from the evidence.  [Citation.] . . . The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.]  '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.'"  [Citations.]  Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.'  [Citations.]"  (*Hajek*, *supra*, 58 Cal.4th at pp. 1182-1183.)

"'Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction.  Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact.'  [Citation.]"  (*People v. Reyes* (1974) 12 Cal.3d 486, 500.)  Likewise, "[t]hat an event *could* have happened . . . does not by itself support a deduction or inference it did happen."  (*People v. Moore* (2011) 51 Cal.4th 386, 406, original italics.)  "When the facts give equal support to two competing inferences, neither is established."  (*People v. Acevedo* (2003) 105 Cal.App.4th 195, 198.)

Finally, our review of the evidence is constrained by the theory of liability upon which the prosecution sought White's conviction.  "To conform to due process of law, [a defendant is] entitled to have the validity of [his] conviction[] appraised on consideration of the case as it was tried and as the issues were determined in the trial court."  (*Cole v. State of Ark.* (1948) 333 U.S. 196, 202 (*Cole*); see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118 (*McCoy*) [where the trial court instructs on direct aiding and abetting liability, without instructing on the natural and probable consequences doctrine, only the defendant's guilt of the intended crime is at issue – i.e., whether the defendant knew of, and shared, the perpetrator's murderous intent].)

16

*B. First Degree Murder and Direct Aiding and Abetting Liability*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  "'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.'  [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

To convict a defendant of murder under a direct aiding and abetting theory of liability, the prosecution must prove the defendant: (1) acted with knowledge of the perpetrator's criminal purpose; (2) acted with the intent or purpose of committing, encouraging, or facilitating the commission of the crime; and (3) by act or advice, aided, promoted, encouraged, or instigated the commission of the crime.  (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)  When the offense charged is a specific intent crime, like first-degree murder, the defendant must share the specific intent of the perpetrator.  (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167 (*Chiu*).)  In other words, the defendant must know "the full extent of the perpetrator's criminal purpose and give aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime."  (*Ibid.*; *McCoy*, *supra*, 25 Cal.4th at pp. 1117-1118.)  An aider and abettor who willfully, deliberately, and with premeditation, assists the perpetrator in killing another person acts with the mens rea required for first degree murder.  (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

While the defendant's presence at the scene of the crime is not required to establish liability as an aider and abettor, mere presence, which does not itself assist the commission of the crime, does not amount to aiding and abetting.  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 91 (*Stankewitz*).)  Further, failure to prevent a crime, even where the defendant has knowledge that one is being committed, does not constitute aiding and abetting.  (*People v. Caluko* (2000) 78 Cal.App.4th 307, 331.)

**II.     Analysis**

The prosecution pursued White's murder conviction on a direct aiding and abetting theory of liability.  It argued Smith arranged for himself, White, and Honest to meet with and kill Ponce in the Lancaster area.  It argued one of Smith, White, or Honest shot and killed Ponce, and the other two helped.  It did not, however, argue Ponce's murder was the natural and probable consequence of some other crime that Smith, White, and Honest intended to commit together, such as assault or robbery.  Likewise, the trial court did not instruct the jury on the principles of aiding and abetting liability under a natural and probable consequences theory.

White contends the prosecution failed to produce sufficient evidence to establish that he intended to kill Ponce or that he knowingly and intentionally facilitated the perpetrator's killing of Ponce.  We agree.  Viewing the evidence in the light most favorable to the prosecution, there is insufficient evidence to establish White aided and abetted Ponce's murder under the direct aiding and abetting theory pursued at trial.

In arguing White was guilty of murdering Ponce, the prosecution relied primarily on two sources of evidence: the cell phone records demonstrating that White's, Smith's, and Honest's cell phones were in close proximity to each other, including near the murder scene at the time of Ponce's killing, from around 10:00 p.m. on October 6 up through the early morning hours of October 7, 2008; and White's inconsistent statements made throughout his May 5, 2010 interview with Detectives Gray and Rodriguez.

With respect to the cell phone records and White's interview statements, that evidence indicates that on the night Ponce was killed, White was in communication with Honest, met with Honest and perhaps Smith, and traveled from the rough vicinity of the crime scene in the same direction and at the same time as Honest and Smith.  A jury could reasonably infer that White was present at the scene of Ponce's murder.  The evidence does not, however, support a reasonable inference that White intended to kill Ponce or that he knowingly and intentionally aided and abetted the person who killed Ponce.

18

Although White initially denied being in the Lancaster area on the night of Ponce's death, he eventually told Detectives Gray and Rodriguez that he went to Lancaster that night to participate in a cargo-moving job with Smith and Honest. Although these statements and the cell phone records place White in the vicinity of the crime scene and the other murder suspects at the time of Ponce's death, there is no other evidence showing what White was doing that night. Importantly, there is no evidence demonstrating that White knew of a plan to kill Ponce or that he intentionally aided in Ponce's killing. Further, no physical evidence found at the crime scene was connected to White, and none of White's fingerprints or belongings were found in Ponce's Navigator.

The Attorney General contends that White's statement to his wife during a call made from jail on May, 6, 2010, that the police were "trying to charge [him] with the murder," demonstrates that White knew Ponce's murder took place, and therefore establishes his guilt when viewed in connection with the cell phone records placing White's phone near where Ponce was killed. Even if we assume that White's statement to his wife establishes that he knew of Ponce's murder because of his interactions with Honest and Smith on the night of the murder, and not because Detectives Gray and Rodriguez repeatedly indicated during White's interview the day before that they were investigating Ponce's murder, that fact would not support an inference that White knew of, and intended to facilitate, a plan to murder Ponce. Such an interpretation of the statement in no way reflects on White's mental state at the time of, and leading up to, Ponce's murder, which occurred more than a year and a half before White made the statement. The statement does not establish White's liability as a direct aider and abettor of first- or second-degree murder, as it does not reflect on the necessary element of intent. (See *Stankewitz*, *supra*, 51 Cal.3d at p. 91; see also *McCoy*, *supra*, 25 Cal.4th at p. 1118.)

The Attorney General next argues that in light of White's inconsistent statements to Detectives Gray and Rodriguez about his whereabouts around the time of Ponce's murder and his relationship with Smith, the jury reasonably could have inferred that White was guilty of first-degree murder. This argument is not persuasive. The prosecution bears the burden of affirmatively proving every element of the charged

19

crime. (*People v. Belton* (1979) 23 Cal.3d 516, 520.) A reasonable inference that a defendant knowingly and intentionally aided in killing the victim must be based on facts established through the evidence presented at trial, and it may not be based solely on mere disbelief of the defendant's statements. (*People v. Velazquez* (2011) 201 Cal.App.4th 219, 231 (*Velazquez*); see also *People v. Stein* (1979) 94 Cal.App.3d 235, 239 ["""""A legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established."""" [Citations.]".) White's initial statements that he was not in Lancaster on the night of Ponce's murder and that he did not know Smith – statements that were later shown to be false – do not tend to prove that he intended to kill Ponce or knowingly and intentionally aided killing Ponce, even when those statements are considered in conjunction with the cell phone records placing his phone near the location where Ponce was killed. Neither White's statements made during the Sheriff's Department's investigation, nor his cell phone records, reflect on his mental state at the time Ponce was murdered.

Finally, the Attorney General argues that, even if insufficient evidence supports White's conviction under a direct aiding and abetting theory, substantial evidence supports his conviction under a natural and probable consequences theory of aiding and abetting liability. This argument is unavailing. As noted above, our review of the evidence produced during the prosecution's case-in-chief is limited by the theory of murder pursued at trial. (See *McCoy*, *supra*, 25 Cal.4th at pp. 1117-1118.) Because the prosecution pursued White's conviction on a direct liability theory only, and the trial court instructed on direct liability principles, without also instructing on natural and probable consequences principles, White's conviction cannot be upheld on a natural and probable consequences theory because such a theory was not at issue before the trial court. (See *Cole*, *supra*, 333 U.S. at p. 202; see also *McCoy*, *supra*, 25 Cal.4th at pp. 1117-1118.)

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter a judgment of acquittal.  (See *Velazquez*, *supra*, 201 Cal.App.4th at p. 234.)


IWASAKI, J.[*]

**We concur:**



**PERLUSS, P. J.**                    **ZELON, J.**

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.